No. 24-1703

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

SIMON AND SIMON, PC, ET AL.,

*Plaintiffs-Appellants,*

v.

ALIGN TECHNOLOGY, INC.,

*Defendant-Appellee.*

————————————

On Appeal from the United States District Court
for the Northern District of California, No. 20-cv-03754; No. 21-cv-03269

————————————

BRIEF FOR THE AMERICAN ANTITRUST INSTITUTE
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

————————————

KATHLEEN W. BRADISH
*Counsel of Record*
DAVID O. FISHER
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 304-0195
kbradish@antitrustinstitute.org

*Counsel for Amicus Curiae*

August 5, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Appellate Rule 26.1(a), the American Antitrust Institute states that it is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT......................................................i

TABLE OF AUTHORITIES ..................................................................... iii

INTEREST OF AMICUS CURIAE ...........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT ....................................................................................5

    I.    Plaintiffs have demonstrated an obviously anticompetitive refusal to deal................................................................................................5

    II.   The district court was wrong to exempt Align's justification from scrutiny simply because it was tangentially related to patent enforcement....................................................................................7

    III.  This case offers an opportunity to provide much-needed clarity to lower courts on how to assess refusals to deal under Section 2........14

CONCLUSION................................................................................28

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 253 (1986) .......................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) ...............................................................25

*California Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) ...............................................................12

*Chase Mfg. v. Johns Manville Corp.*,
601 F. Supp. 3d 911 (D. Colo. 2022) ......................................17

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*,
No. 22-2168, 2024 WL 3642432 (4th Cir. Aug. 5, 2024) ...................18

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ...............................................................13

*Epic Games, Inc. v. Apple, Inc.*,
67 F. 4th 946 (9th Cir. 2023).................................................17

*FTC v. AbbVie*,
329 F. Supp. 3d 98 (E.D. Pa. 2018).........................................2

*FTC v. Actavis*,
570 U.S. 136 (2013)..................................................... *passim*

*FTC v. Qualcomm, Inc.*,
969 F.3d 974 (9th Cir. 2022)..................................... 6, 14, 27

*High Tech. Careers v. San Jose Mercury News*,
996 F.2d 987(9th Cir. 1993).................................................17

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997)..................................... *passim*

*In re K-Dur Antitrust Litig.*,
    686 F.3d 197 (3d Cir. 2012).................................................................11

*Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*,
    466 F.3d 187 (2d Cir. 2006)................................................................11

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004)......................................................... 6, 19

*Morris Commc'ns. Corp. v. PGA Tour, Inc.*,
    364 F.3d 1288 (11th Cir. 2004)...........................................................21

*Mylan Pharms. v. Celgene Corp.*,
    No. 14-2094, 2018 WL 1129947 (Oct. 3, 2018) ...................................2

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*,
    323 F. Supp. 2d 559 (S.D.N.Y. 2004)..................................................21

*New York ex rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)..................................................................2

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) .......................................................................18

*Pro. Real Est. Invs. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993) ....................................................................... 12, 13

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam) ...................3, 6, 9

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003) ...............................................................17

*Verizon Commc'n., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..................................................................... *passim*

*Viamedia, Inc. v. Comcast Corp.*,
    951 F.3d 429 (7th Cir. 2020) ..............................................................18

*Wilk v. Am. Med. Ass'n*,
    895 F.2d 352 (7th Cir. 1990)...............................................................17

**OTHER AUTHORITIES**

Edward D. Cavanaugh, *A 2020 Agenda for Reinvigorated Antitrust Enforcement: Four Big Ideas*, 105 Cornell L. Rev. Online 31 (2020). .......................................28

Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483 (2022).......................................................................................... *passim*

Herbert Hovenkamp & Fiona Scott-Morton, *Framing the Chicago School of Antitrust Analysis*, 168 U. Pa. L. Rev. 1843 (2020). .............................................28

Herbert Hovenkamp, *Monopolizing Digital Commerce*, 64 Wm. & Mary L. Rev. 1677 (2023).......................................................................................27

Herbert Hovenkamp, *The Rule of Reason and the Scope of the Patent*, 52 San Diego L. Rev. 515 (2015) ..............................................................10, 11

Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81 (2018).....................18

John B. Kirkwood, *The Methods of Antitrust Law: Antitrust and Output*, 53 U. Balt. L. Rev. 427 (2024); ................................................................. 15, 28

Jonathan B. Baker, *Taking the Error Out of "Error Cost" Analysis: What's Wrong with Antitrust's Right*, 80 Antitrust L.J. 1 (2015)..................................28

Lina M. Khan, *The Ideological Roots of America's Market Power Problem*, 127 Yale. L.J. 960 (2018) ...........................................................................28

Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 853 (1989) ..............................................................24

Pretext, Oxford English Dictionary (3rd ed. 2024) ..................................................12

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.1 (2017) ....................................................9

## INTEREST OF *AMICUS CURIAE*[1]

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. *See* http://www.antitrustinstitute. org.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

At bottom, this case involves actions taken by a dominant firm to avoid losing monopoly profits at the end of its patent protections. The technology involved, clear aligners, may be unique, but the story is a familiar one. In the pharmaceutical context, product-hopping, improper Orange Book listings, denials

---

[1] All parties have consented to the filing of this amicus. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than *amicus curiae* or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

[2] Individual views of members of AAI's Board of Directors or Advisory Board may differ from AAI's positions. Certain members of AAI's Board of Directors or Advisory Board, or their law firms, represent Plaintiffs-Appellants, but they played no role in AAI's deliberations with respect to the filing of the brief.

of testing samples to generics, and reverse payment settlements are well-recognized techniques brand manufacturers use to avoid the patent cliff, stave off competition, and preserve supracompetitive profits for as long as possible. Antitrust law has found ways under both Section 1 and 2 of the Sherman Act to address such abuses.[3] The district court decision here, however, creates a dangerous precedent that provides a roadmap for others seeking to extend their monopoly profits beyond their patent terms. It grants an unprecedented, broad immunity within the already narrow confines some courts have created for a Section 2 refusal to deal claim.

At issue here is not whether Plaintiffs' Section 2 allegations constitute a proper refusal to deal claim. The district court has plainly acknowledged they do. Order Denying Mot. to Dismiss 4, 10-12, ECF No. 91 ("[T]he termination of the interoperability agreement, as alleged in the complaint, amounts to a Section 2 violation on its own.") (hereinafter "MTD Order"). Instead, the case turns on how the court applied this Circuit's prescribed burden-shifting framework in Section 2

_____

[3] *See, e.g., New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) (granting preliminary injunction to prevent product hop); *FTC v. AbbVie,* 329 F. Supp. 3d 98 (E.D. Pa. 2018) (finding brand manufacturer violated antitrust laws by conduct including improperly listing patents in the FDA's Orange Book) (reversed and remanded on other grounds, *FTC v. AbbVie,* 976 F.3d 327 (3d. Cir. 2020); *Mylan Pharms. v. Celgene Corp.*, No. 14-2094, 2018 WL 1129947 (Oct. 3, 2018) (denying summary judgement on refusal to provide REMS sample claim). See further discussion of reverse payment settlement claims below.

2

cases. That analysis was insufficient in at least two ways: (1) it failed to assess whether Align's proffered justification was in fact procompetitive, and (2) it failed to balance that justification against the demonstrated anticompetitive effect.

These errors have a common source: a flawed reading of key precedent on the antitrust treatment of patent enforcement. The district court bypassed essential steps of the analysis by relying on a wide-ranging immunity for patent enforcement conduct. But such an immunity does not exist. *See, e.g.*, *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001) (en banc) (per curiam). Any doubt on that score was put to rest by the Supreme Court in *FTC v. Actavis*, 570 U.S. 136, 147 (2013), when it rejected the argument that patent settlement restrictions within the "scope of the patent" were immune from antitrust attack.

These claims of immunity debunked, the case, focused as it is on the defendant's business justifications, offers an important opportunity for this Circuit to clarify its Section 2 burden-shifting analysis. Specifically, it allows this Circuit to state unambiguously that once plaintiffs have shown an anticompetitive effect, the burden lies with defendants to establish a nonpretextual, procompetitive justification on the facts. To prevail on summary judgment, the defendant must show there is no material factual dispute over whether its justification is either procompetitive or pretextual.

Finally, this case offers a chance for this Circuit to address an important gap in refusal to deal caselaw: the different risk calculus inherent in "secondary" refusals to deal. Align allegedly has used its monopoly power in its primary market (the market for aligners) to inhibit competition in a secondary market into which it has vertically integrated (the market for scanners). As discussed below, *infra* at Part IV., academics have described how the calculations that drove the Supreme Court's skeptical and cautious approach in *Trinko*—including concerns about protecting investment incentives, enabling collusion, ensuring administrable remedies, and balancing error costs—do not translate to secondary refusals to deal. As a result, it is logical to apply *Trinko*'s teachings in a way that acknowledges those differences.

For all these reasons, the order on summary judgement should be reversed and remanded with clarification of this Circuit's burden-shifting analysis.

**ARGUMENT**

## I. Plaintiffs have demonstrated an obviously anticompetitive refusal to deal.

As the district court explained when it denied Align's motion to dismiss, Plaintiffs have alleged actions by Align that comfortably meet any test of unlawful monopolization through refusal to deal. MTD Order at 4, 11–13 ("[T]he allegations about the termination are sufficient to raise a reasonable expectation that discovery will reveal evidence of illegal conduct"). At summary judgment, Plaintiffs supported those allegations with ample evidence.

Align's course of dealing with 3Shape, an alternate provider of the scanner technology essential to clear aligner sales, has all the hallmarks of an anticompetitive refusal to deal. First, Plaintiffs showed clear anticompetitive harm from Align's termination of interoperability. Dentists with 3Shape scanners are no longer able to provide their patients with Invisalign, reducing Align's own output. And dentists making the expensive one-time investment in scanner technology are forced to choose the iTero or lose access to Align's market-dominating brand. Locked into Align's scanner technology, these dentists no longer have the option to prescribe any other company's clear aligners, foreclosing a key pathway for competitors who might challenge Align's monopoly in the aligner market.

Second, Plaintiffs have shown that Align acted with predatory intent by sacrificing short-term profits and customer goodwill and discriminating on the

5

basis of rivalry. *See, e.g.*, Order Granting Mot. for Summ. J. 3, ECF No. 548 ("There is also evidence that Align knew its course of conduct would diminish its own clear aligner profits in the short term.") (hereinafter "MSJ Order"). These are key factors the *Trinko* court identified as present in the Court's other refusal to deal cases but not in *Trinko. See Verizon Commc'n., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 409–10 (2004); *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020).

Third, Plaintiffs have demonstrated a long-standing voluntary and profitable prior course of dealing. This benchmark of the terms on which the monopolist has otherwise been willing to deal has been identified by the *Trinko* Court and others as addressing concerns about administrability and protecting investment incentives. *See, e.g.*, *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1133 (9th Cir. 2004).

Finally, Plaintiffs showed that Align was motivated by the "desire to harm an emerging competitor, which would help Align gain share in the scanner market and preserve dominance in the clear aligner market." MSJ Order at 3. Such evidence of anticompetitive intent significantly strengthens the inference that Align's conduct had an anticompetitive effect. *See Microsoft*, 253 F.3d at 77–78.

**II.     The district court was wrong to exempt Align's justification from scrutiny simply because it was tangentially related to patent enforcement.**

The district court neither disputed nor deemed inadequate Plaintiffs' evidence of anticompetitive effect. *See supra* at Part I. Instead, it allowed a single argument to upend its entire analysis. Align claimed that its termination of interoperability helped it address a possible affirmative defense in patent litigation. Despite conflicting evidence, the district court found the justification presumptively procompetitive. MSJ Order at 2. It granted Align summary judgment, even while acknowledging that it was a "close call." *Id.* at 1.

The district court explained its pivot with a citation to this Court's 1997 decision in *Image Technical Services, Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997). The monopolist's "desire to protect and enforce patent rights," it wrote, "is a presumptively valid business justification." MSJ Order at 2 (citing *Image Tech. Servs.,* 125 F.3d). Absent a showing the litigation was a "sham" or "irrational," the district court concluded, no further scrutiny of Align's justification was warranted. *Id.*

This was a fundamental misstep, and its logic conflicts with precedent, including clear Supreme Court rulings, in two ways. The district court began with a definition of what is "presumptively valid" that incorrectly focuses on the patent litigation as a whole rather than the decision to terminate interoperability,

7

purportedly to mitigate a potential affirmative defense. Then it wrongly imported a "sham" standard for any rebuttal. *Id.* Together, these mistakes would, if uncorrected, put a broad range of conduct only tangentially related to patent enforcement out of the reach of antitrust law. This cannot be correct because the Supreme Court has already ruled out such sweeping immunity. In *FTC v. Actavis*, the Court found that settlements associated with patent cases, even if "within the scope of the exclusionary potential of the patent," were, not "immunize[d] […] from antitrust attack." 570 U.S. at 147 (internal quotations omitted).

First, the scope of "presumptively valid" conduct under *Image Tech. Servs.* does not reach as far as the district court would have it. There, the defendant's proffered justification was straightforward: protecting its patents from infringement. In *Image Tech. Servs.*, defendant Kodak claimed (although it ultimately failed to show) that it refused to license rival repair providers out of concern that they would copy Kodak's products and undermine its patents.

This is not Align's claim. Align does not argue, as Kodak did, that termination was necessary to protect its patent from infringement. Indeed, it does not claim *any* effect on 3Shape's alleged infringement. Instead, it argues that termination mitigated the risk of a potential affirmative defense and better positioned it in ongoing litigation. This is a litigation strategy, not patent enforcement. At best, it is several steps removed from the actions to "exclud[e]

8

others from its protected work" that the court sought to protect in *Image Tech. Servs*. 125 F.3d at 1218.

The precept of "presumptive validity" described in *Image Tech. Servs*. does not stretch far enough to cover actions so tangential to patent enforcement. If it did, it would shield from scrutiny a wide range of potentially anti-competitive conduct based only on a defendant's claim, no matter how weak, that it increased its odds in patent litigation. The boundaries of protection would extend as far as the most creative lawyer's imagination allows.

This does not reflect the balance that courts, including the Supreme Court, have struck between patents and antitrust policy. As a rule under the antitrust laws, intellectual property enjoys no special status over other kinds of property. *See, e.g.*, U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 2.1 (2017) ("The Agencies apply the same general antitrust principles to conduct involving intellectual property that they apply to conduct involving any other form of property."). So too here. There is no "absolute and unfettered right" to use intellectual property as one wishes. *Microsoft*, 253 F.3d at 63. As the D.C. Circuit explained, "[t]hat is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability." *Id.* Translated to this context, the right to defend one's patents in court

9

does not license a patent holder to do anything it wants under the guise of improving its litigation chances.

The Supreme Court has said as much. By putting patent litigation strategies like Defendant's termination outside the reach of antitrust scrutiny, the district court effectively adopted a broad "scope of the patent" test for refusals to deal involving patented products. Originally a patent law concept, the "scope of the patent" test entered antitrust law, as Professor Herbert Hovenkamp's comprehensive study has explained, as a way for defendants to try to cabin antitrust liability. In the antitrust context, the test casts the "patent as a walled garden whose contents are free from antitrust scrutiny, provided that the challenged conduct stays inside the wall." Herbert Hovenkamp, *The Rule of Reason and the Scope of the Patent*, 52 San Diego L. Rev. 515, 527 (2015). Professor Hovenkamp's examination concludes the test "is not a helpful tool for antitrust analysis" because it can "create[] an enclosure that protect[s] collusion or anticompetitive exclusion from antitrust scrutiny." *Id.* at 516.

Never without controversy, the "scope of the patent" test came under direct Supreme Court scrutiny in *Actavis*, 570 U.S. 136. The Eleventh Circuit, together with the Second Circuit, had relied on the test to find that pharmaceutical patent settlements, even those with suspicious "reverse" payments from the patent owner to the alleged infringer (instead of vice versa), were "immune from antitrust

10

attack" if its restrictions did not extend beyond the patent expiration. *Id.* at 140; *see Joblove v. Barr Labs., Inc. (In re Tamoxifen Citrate Antitrust Litig.)*, 466 F.3d 187, 212–13 (2d Cir. 2006). Other circuit courts had disagreed and held the terms of such settlements accountable to the antitrust laws. *See In re K-Dur Antitrust Litigation*, 686 F.3d 197, 214–18 (3d Cir. 2012) ("the scope of the patent test… improperly restricts the application of antitrust law and is contrary to the policies underlying the Hatch-Waxman Act and a long line of Supreme Court precedent on patent litigation and competition.").

The Supreme Court considered the split and firmly rejected a test it feared would immunize a broad swath of potentially anticompetitive activity under the guise of patent enforcement. 570 U.S. at 158. The Court explained that the "scope of the patent" test goes awry by measuring "anticompetitive effects solely against patent law policy" rather than also considering procompetitive antitrust policies. *Id.* at 148. Asking only what the holder of a valid patent could do under patent law, the Court observed, is insufficient to confer immunity, especially in the litigation context, where the patent "may or may not be valid, and may or may not be infringed." *Id.* Instead, the Court laid out a list of factors that weighed in favor of a full competitive effects analysis of the settlement terms, including the significant "potential for genuine adverse effects on competition" and the likelihood that the terms may be proven "unjustified." *Id.* at 154–58.

11

The district court here repeated the mistake made by the Eleventh Circuit in *Actavis*. It refused to evaluate the legitimacy of the termination as a litigation strategy, ignoring evidence that the termination was actually more harmful than helpful to its patent litigation. As a result, it considered only what the Supreme Court described in *Actavis* as the "patent-related factor" and not the antitrust policies also "relevant in determining the scope of the patent monopoly" — an oversight made more problematic given the undisputed anticompetitive effects of the termination on Align's only viable source of competition. *Id.* at 148.

The district court compounded this error by conflating the proof that a justification is "pretextual" with the test for sham litigation. Pretextual and sham have distinct meanings in ordinary use and in antitrust caselaw. Pretextual suggests an underlying intent hidden by a superficial or misleading explanation. *See, e.g.*, Pretext, Oxford English Dictionary (3rd ed. 2024) ("A reason put forward to conceal one's real purpose or object; a pretended motivation for a selfish or criminal act; an excuse or pretence."). Sham, on the other hand, is defined repeatedly in antitrust caselaw as "objectively baseless." *See, e.g.*, *Pro. Real Est. Invs. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993). The need to show that an ostensible justification is a "sham" is limited to a very few cases, all relating to constitutional First Amendment protections. *See, e.g., California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).

12

The "sham" standard is implicated only when actions would otherwise be immune from antitrust scrutiny under the Noerr-Pennington doctrine. That immunity, which protects petitioning of the government, reflects the need to balance antitrust considerations and the constitutional right to free speech. *See, e.g.*, *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961) ("[T]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade those freedoms."). Limiting antitrust liability to a narrow exception for sham petitioning in these cases is justified only by the overwhelming importance of the constitutionally protected rights at issue.

No such overwhelming interest is present here. To be sure, litigation is among the types of petitioning potentially covered by the Noerr-Pennington doctrine. *See Pro. Real Est. Invs.*, 508 U.S. at 50, 60–61 (1993). But, here, the filing or pursuit of litigation is not the challenged conduct; the termination of a prior course of dealing is. The Supreme Court, in *Actavis*, made a similar distinction between pursuit of litigation and settlement when it explicitly rejected the Eleventh Circuit's conclusion that a patent settlement was immune "absent sham litigation or fraud." *Actavis*, 570 U.S. at 146, 158.

In short, the district court was incorrect to exempt from scrutiny Defendant's justification for termination of 3Shape simply because it was ostensibly connected

13

to patent litigation. Given the ample evidence of anticompetitive intent and effect in this case, the only path consistent with the Supreme Court's mandate in *Actavis* is for a jury to evaluate all the relevant evidence on justification and competitive effect and conduct its own balancing of harms.

### III. This case offers an opportunity to provide much-needed clarity to lower courts on how to assess refusals to deal under Section 2.

Once the district court's erroneous application of *Image Technical Services* is corrected, this case offers an opportunity for this Court to provide much-needed clarity to district courts on how to assess refusals to deal. The broad language of Section 2 reflects Congress's intent to broadly prohibit efforts to obtain or maintain monopoly power through the exclusion of competition, and the requirements to show a violation of Section 2 are the same regardless of whether the case is categorized as a "refusal to deal" or some other category of alleged anticompetitive conduct. *See, e.g.*, *Qualcomm*, 969 F.3d at 991, 996. But in the refusal-to-deal context, experts have criticized courts for eschewing their responsibility of parsing out which refusals are exclusionary and which are not, tending instead to impose strict evidentiary hurdles which do not reliably predict exclusion and to invoke Supreme Court *dicta* to justify erring on the side of non-intervention. *See, e.g.*, Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1483 (2022) ("[C]ourts are emphatic that a duty to deal is almost never warranted, but simple economic arguments show that the refusals in these cases are

14

routinely exclusionary," and the "suffocating evidentiary requirements" courts have erected "bear little logical connection to exclusion.") (hereinafter "*Antitrust Duty to Deal*"); John B. Kirkwood, *The Methods of Antitrust Law: Antitrust and Output*, 53 U. Balt. L. Rev. 427, 430 (2024)("Courts also derail antitrust cases through procedural devices," such as "adopting doctrines that ban or skew fact-finding, deciding cases while ignoring facts, using dicta to formulate doctrine, and tolerating confusion and complexity.").[4]

The district court's opinion is an example of these tendencies. As described above, it found all the hallmarks of an exclusionary refusal to deal, including "plenty of evidence that Align's course of conduct was motivated . . . by a desire to harm an emerging competitor, which would help Align gain share in the scanner market," and "that Align knew its course of conduct would diminish its own clear aligner profits in the short term."  MSJ Order at 3. Nevertheless, the Court took Align at its word that terminating interoperability was critical to its patent case and

---

[4] These tendencies are particularly concerning in contemporary markets, where platform monopolists tend to be vertically integrated and can exclude rivals' access to shared markets. *See* Hovenkamp, *Antitrust Duty to Deal* at 1488–89 (discussing examples of refusals to deal involving "a platform that vertically integrates into some product market and then allegedly discriminates against competing producers of that product by making it harder for them to reach consumers over the platform").

labelled the justification "presumptively valid" without scrutinizing its factual basis or its effect on competition. *Id.* at 2.[5]

The lower court's opinion demonstrates a need for clarity in the refusal to deal jurisprudence. This Court should clarify for lower courts that: (1) as the movant at summary judgment, Align bears the burden to show there is no factual dispute over the validity of its claimed justification; and (2) the concerns which motivated the Court in *Trinko* are not present in secondary refusals to deal.

---

[5] Although the Court found that Align had sacrificed short-term profits, it recognized that this is not a requirement of a refusal-to-deal claim, but merely one set of facts which tends to indicate that the monopolist's behavior makes no economic sense but for its anticompetitive purpose. MTD Order at 12–13; *see Antitrust Duty to Deal* at 1493–1501 (distinguishing "no economic sense" test from narrower "profit sacrifice" test). Similarly, the Court correctly rejected Align's arguments that, in order to establish their *prima facie* case, Plaintiffs needed to match the exact fact pattern of *Aspen Skiing* by showing that "Align was entirely willing to have similar interoperability agreements with other scanner companies" MSJ Order at 4. This Court should similarly decline Align's invitation to erect these further evidentiary hurdles on refusal-to-deal plaintiffs.

16

**A.** **As the movant-defendant at summary judgment, Align must show there is no genuine dispute it carried its burden at step two of the rule of reason analysis.**

Under antitrust rule-of-reason analysis, where, as here, "a plaintiff establishes at step one that the defendant's restraints impose substantial anticompetitive effects, then the burden shifts back to the defendant to show a procompetitive rationale for the restraints." *Epic Games, Inc. v. Apple, Inc.*, 67 F. 4th 946, 985–86 (9th Cir. 2023) (quoting *NCAA v. Alston*, 141 S. Ct. 2141, 2160 (2021)) (internal quotations omitted). Courts are split as to whether the defendant must carry a burden of persuasion or merely a burden of production at step two. *See Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 362 (7th Cir. 1990) (characterizing as burden of persuasion); *Chase Mfg. v. Johns Manville Corp.*, 601 F. Supp. 3d 911, 933 (D. Colo. 2022) (same); *but see United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003) (characterizing as burden of production). But there is no question that the defendant carries the burden. *Epic Games*, 67 F. 4th at 985–86.

As the movant at summary judgment, Align had to show not only that it carried its burden at step two, but that there is no *factual* dispute as to whether it has done so. This is because, at summary judgment, all reasonable inferences must be made in favor of the non-moving party, and "[w]hether valid business reasons motivated a monopolist's conduct is a question of fact." *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (citing *Eastman Kodak*, 504

17

U.S. at 483 (1992)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253–54 (1986). If a factfinder could reasonably infer that the movant-monopolist's proffered justification is pretextual, then the movant-monopolist is not entitled to summary judgment. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, No. 22-2168, 2024 WL 3642432, at *20 (4th Cir. Aug. 5, 2024) ("[A]ccepting [Defendant's] business justifications as fact at this stage of the litigation would require resolving factual disputes in favor of [Defendant], in violation of the applicable standards for summary judgment."); *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 488 (7th Cir. 2020) ("[The] "defendant bears the burden of presenting a 'nonpretextual claim' and proving procompetitive justification *on the facts*.") (emphasis added); *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2291 (2018) (Breyer, J., dissenting) ("[T]he burden shifts to the defendant to show that the restraint *in fact* serves a legitimate objective.") (internal quotations omitted); *see also* Herbert Hovenkamp, *The Rule of Reason*, 70 Fla. L. Rev. 81, 110 (2018)("Acceptance of justifications presents issues of both proof and policy. Not every proffered justification will save a restraint, even if the justification has factual support.")

The district court correctly recognized that "a burden-shifting framework that involves an inquiry into whether a proffered justification is pretextual would make little sense if the inquiry ends the moment a conceivable rationale can be

theorized." MSJ Order at 4. At the same time, however, the Court failed to address Plaintiffs' arguments that Align's proffered justification made little sense in context, and it made inferences in Align's favor about the legitimacy and pro-competitiveness of Align's proffered justification. Pls.' Mem. Opp'n to Align's Mot. for Summ. J. and Daubert Mot. 11; MSJ Order at 2-3. The Court thus failed to put Align to the task of "proving procompetitive justification *on the facts*," *Comcast*, 951 F.3d at 488, effectively ending the inquiry "the moment a conceivable rationale can be theorized" based on the factual record. MSJ Order at 4. Had the Court held Align to its burden of *showing* that its termination of interoperability was non-pretextual and procompetitive, it would have found that the termination did not, in fact, help Align's patent case. *See* Pl.-Appellants' Br. 19, 23. At the very least, the genuine factual disputes over the legitimacy and pro-competitiveness of Align's justification should have foreclosed summary judgment.

**B.** **The concerns which motivated the majority in *Trinko* are not present in secondary refusals to deal.**

Much of the extreme caution with which courts approach refusal to deal cases can be traced to four pieces of *dicta* in *Trinko*, none of which are applicable here. *See MetroNet Servs. Corp.*, 383 F.3d at 1131(citing *Trinko*, 540 U.S. at 411, 407–08) (articulating concerns of diminishing investment incentives, the difficult of administrability, and the possibility of fostering collusion); *Trinko*, 540 U.S. at

19

414 ("The cost of false positives counsels against an undue expansion of § 2 liability."). Unlike the "primary" refusal to deal examined in *Trinko*, this case presents a "secondary" refusal to deal: Align is using its monopoly power in its primary market (the market for aligners) to inhibit competition in a secondary market into which it has vertically integrated (the market for scanners).[6] In *Trinko*, by contrast, the plaintiff alleged only that Verizon used the monopoly power which it gained on the merits in its primary market (the market for local phone services) to inhibit competition *in that same market*. *Trinko*, 540 U.S. at 401–04; Hovenkamp, *Antitrust Duty to Deal* 1502–07 (distinguishing "primary" and "secondary" refusals to deal and arguing that "[t]he basic purpose of the distinction is to determine whether antitrust intervention would deprive the defendant of a monopoly it earned on the merits."). Here, recognizing a duty to deal in the secondary (scanner) market by ordering Align to reinstate interoperability would do nothing to disturb Align's dominance in the primary (aligner) market, nor would it allow 3Shape to "free ride" off any technology Align developed. Instead, reinstating interoperability would return competition to the scanner market by

---

[6] In this way, secondary refusals to deal raise substantially the same theory of harm as tying arrangements (wherein "a firm sells a primary product only on the condition that buyers also purchase a secondary product") in that they both involve a dominant firm that is "exploiting its preexisting monopoly in a primary market to foreclose competitors in a secondary market." Hovenkamp, *Antitrust Duty to Deal* at 1491.

incentivizing both 3Shape and Align to invest in better scanner technology to compete against each other.

1. *Lessening investment incentives*

In *Trinko*, the Supreme Court cautioned against forcing firms to give up monopoly power which they have gained on the merits, warning that doing so may lessen firms' incentives to invest in innovation. *Trinko*, 540 U.S. at 407. In that case, Verizon developed its telephone network to provide local phone service to consumers, and rivals wanted to interconnect with that network so that they could offer competing phone service without having to build their own networks. *Trinko*, 540 U.S. at 401–04. A mandate that those rivals be permitted to interconnect on reasonable terms would have eroded Verizon's monopoly power over local phone service, hindering Verizon's ability to charge monopoly prices, and thus reducing its incentives to innovate. *Id.* This is the hallmark of a primary refusal to deal. Hovenkamp, *Antitrust Duty to Deal* at 1507.[7]

---

[7] Consistent with *Trinko*, courts consistently rejected primary refusal theories where a duty to deal would allow rivals to "free ride" off the technology or infrastructure developed by the monopolist. *See, e.g., Morris Commc'ns. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295–98 (11th Cir. 2004) (finding prevention of rival from "free-riding" on monopolist-developed scoring system was non-pretextual business justification); *N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*, 323 F. Supp. 2d 559, 571 (S.D.N.Y. 2004) ("[Defendant] has a legitimate business interest in preventing its competitor . . . from free-riding on [Defendant's] settlement prices.").

21

In secondary refusal cases, by contrast, the duty to deal leaves intact the monopolist's primary market share and its ability to charge monopoly prices. Hovenkamp, *Antitrust Duty to Deal* at 1503. Here, reinstating interoperability would only require Align to permit access in the market for scanners; Align would not lose market power in the market for aligners and 3Shape would not be able to "free ride" off any technology which Align developed. *See* Hovenkamp, *Antitrust Duty to Deal* at 1505 (describing Align's refusal to deal with 3Shape as secondary refusal). This case therefore does not present a danger of lessening Align's incentives to invest in the aligner technology which drove its growth.

Nor does a duty to deal disincentivize the rival in a secondary refusal case. In fact, such a duty serves to *increase* the rival's investment incentives by ensuring that the rival can effectively commercialize the technology it has developed. *Id.* at 1507. Here, 3Shape developed Trios but cannot market Trios effectively because Aligns' termination of interoperability means Trios cannot be used to get the most popular aligner. Reinstating interoperability would increase 3Shape's incentives to invest in better scanner technology by allowing it to market that technology to the broadest possible market.

Indeed, intervention in secondary refusals tends to enhance both the monopolist's and its rivals' incentives to invest in the secondary market. Hovenkamp, *Antitrust Duty to Deal* at 1528. Because of Align's refusal to deal,

22

even if 3Shape developed a higher-quality or cheaper Trios, many dentists would still choose the iTero, not because it is better or more affordable, but because Align has made it impossible to get Invisalign with the Trios. At the same time, Align has a diminished incentive to invest in improving the iTero, since it can outperform 3Shape and other rivals without having to offer a better product. Requiring Align to stand by its operability agreement would promote competition by incentivizing both Align and 3Shape to invest in better scanner technology.

### 2. *Inviting Collusion*

The majority in *Trinko* also cautioned against an antitrust duty to deal because "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." *Trinko*, 540 U.S. at 408. This concern arises out of the fact that, in a primary refusal case, the rival competes in the same market in which the monopolist has market power. In *Trinko*, if the Court required Verizon to allow rivals to connect to its network, rivals could easily use those negotiations to gain exclusivity over a geographical area, leading to local telephone monopolies. *See id.* But the threat of collusion is remote in cases of secondary refusal to deal where, as here, the rival does not compete against the monopolist in its primary market. Hovenkamp, *Antitrust Duty to Deal* at 1504. 3Shape does not manufacture aligners and—as evidenced by its repeated refusal to grant Align exclusivity—has no incentive to collude with Align to corner the aligner market. MTD Order at 4, 12–

23

13. Meanwhile, Align continues to sell the iTero, giving it little incentive to collude with 3Shape in the scanner market.

More broadly, the fear that recognizing an antitrust "duty to deal" might invite collusion ignores the fact that the underlying refusal to deal may have had a more exclusionary effect than would any hypothetical collusion. Hovenkamp, *Antitrust Duty to Deal* at 1514, n.161. Here, exclusion is already present: because of Align's refusal to deal, 3Shape is not competing with iTero for customers who want to prescribe Invisalign. By declining to intervene, the Court is accepting a very real form of exclusion out of fear of some hypothetical future exclusion.[8]

### 3. *Administrability*

The Supreme Court in *Trinko* warned that courts should avoid recognizing an antitrust duty to deal where the remedy "requires the court to assume the day-to-day controls characteristic of a regulatory agency." 540 U.S. at 415 (quoting Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 853 (1989)). In particular, the Court was wary of cases which may require courts to "act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill-suited." *Id.* The

---

[8] The fear of inviting collusion also ignores the fact that collusion between competitors is, of course, illegal. *See Antitrust Duty to Deal* at 1514, n.161. Plaintiffs in this case and or any other Trios or iTero customer would have a cause of action to challenge any hypothetical collusive agreement between 3Shape and Align to allocate the scanner market.

24

*Trinko* plaintiffs sought a permanent injunction to prevent Verizon from providing network access "on terms and conditions that are not as favorable as those that Verizon enjoys," which the Court declined to grant on the basis that "an antitrust court is unlikely to be an effective day-to-day enforcer of these detailed sharing obligations." *Id.* at 415 (internal quotations omitted).

Administrability concerns are heightened in primary refusal-to-deal cases where there are no third-party dealings on which to base a remedy, such as where the only valuable use of the input is to facilitate production and distribution of the primary product. Hovenkamp, *Antitrust Duty to Deal* at 1531. But courts need not act as central planners or engage in regulatory monitoring in secondary refusals to deal where, as here, the essential terms of dealing are already apparent from the monopolist's prior course of dealing. *Id*. Here, Align and 3Shape have already contracted for interoperability, and the Court need merely order Align to adhere to that contract. Far from the "detailed sharing obligations" sought by the plaintiffs in *Trinko*, this is precisely the type of injunctive relief which courts are equipped to order. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 598 n.23 (1985) (affirming four-year injunction "requiring the parties to offer jointly a 4-area, 6-out-of-7-day coupon booklet substantially identical to the 'Ski the Summit' booklet accepted by Ski Co. at its Breckenridge resort in Summit County, Colorado").

4. *Error Cost*

Lastly, the Court's ruling in *Trinko* was motivated in part by its error-cost analysis. On the one hand, based on its conclusion that recognizing a duty to deal may disincentivize investment, the majority considered that "false condemnations are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Trinko*, 540 U.S. at 414 (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986)). On the other hand, because state and federal regulators had already imposed penalties and reporting requirements on Verizon for breaching its sharing duties, the Court considered the regulatory regime to be an "effective steward of the antitrust function," and thus that the benefits of imposing antitrust liability on Verizon for the same breach were "slight." *Id.* at 413–14.

Neither of the conclusions underlying the court's error-cost analysis in *Trinko* apply here. As explained above, rather than chilling investment incentives, condemning secondary refusals to deal tends to *reintroduce* competition into an artificially divided market. *See supra* at Part III. B.1. The threats to innovation which led the Court to preach caution in *Trinko* are thus inapplicable in secondary refusals. Nor are the benefits of finding antitrust liability here slight: unlike in *Trinko*, no regulatory scheme exists here to address Align's exclusionary behavior. Antitrust law provides the only corrective. *See* Herbert Hovenkamp, *Monopolizing*

26

*Digital Commerce*, 64 Wm. & Mary L. Rev. 1677, 1720 (2023) ("The most relevant holding in *Trinko* was that the antitrust laws should not be used to graft a private remedy onto a regulatory statute that did not contain one."). And the costs of inaction are high: failing to condemn Align's exclusionary conduct signals to other monopolists that they can engage in exclusionary conduct with impunity, undermining the Sherman Act's goals of "encouraging innovation, industry and competition." *Qualcomm*, 969 F.3d at 988.

More broadly, the Court's error cost analysis in *Trinko* hinges on the outmoded notion that monopolies tend to be positive economic forces. *See Trinko* 540 U.S. at 407 (opining that "possession of monopoly power" and "charging of monopoly prices" are "an important element of the free-market system" which "produces innovation and economic growth"). The Court was also informed by economic assumptions that markets are inherently self-correcting, and monopolistic behavior would be inevitably thwarted by new entrants. But contemporary antitrust scholarship teaches that, far from engines of innovation, monopolies tend to "raise prices, lower output, create disincentives to innovate or to pursue efficient production measures, retard investment, hinder entrepreneurship, and limit individual economic freedom." Edward D. Cavanaugh, *A 2020 Agenda for Reinvigorated Antitrust Enforcement: Four Big Ideas*, 105

27

Cornell L. Rev. Online 31, 36 (2020).[9] And contemporary economists sharply question the Chicago School's teachings on market self-correction, finding instead "that markets tend more naturally to situations of market power." Herbert Hovenkamp & Fiona Scott-Morton, *Framing the Chicago School of Antitrust Analysis*, 168 U. Pa. L. Rev. 1843, 1870–71 (2020).[10]

## CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment should be reversed and the case remanded for further proceedings.

Respectfully submitted,

/s/ Kathleen W. Bradish
KATHLEEN W. BRADISH
DAVID O. FISHER
AMERICAN ANTITRUST INSTITUTE
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC 20036
(202) 304-0195
kbradish@antitrustinstitute.org

---

[9] *See also generally* Jonathan B. Baker, *Taking the Error Out of "Error Cost" Analysis: What's Wrong with Antitrust's Right*, 80 Antitrust L.J. 1 (2015); John B. Kirkwood, *The Methods of Antitrust Law: Antitrust and Output*, 53 U. Balt. L. Rev. 427 (2024); Lina M. Khan, *The Ideological Roots of America's Market Power Problem*, 127 Yale. L.J. 960 (2018).

[10] *See also* Herbert Hovenkamp & Scott-Morton, 168 U. Pa. L. Rev. at 1871. ("Given the strong incentive that firms have to cease competing, and the strong ability they have to reduce competition in the absence of antitrust laws, it is economically naïve to assume that markets will naturally tend toward competition.")

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated                    .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                                                        **Date**
*(use* "s/[typed name]" *to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                        *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate ACMS system. Counsel for all parties to the case are registered ACMS users and will be served by the appellate ACMS system.

<u>s/ Kathleen W. Bradish</u>

Dated: August 5, 2024