Nos. 24-1703, 24-1783

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

─────────────────────

SIMON AND SIMON, PC, AND VIP DENTAL SPAS,
*Plaintiffs-Appellants,*

v.

ALIGN TECHNOLOGY, INC,
*Defendant-Appellee,*

─────────────────────

MISTY SNOW, ET AL.,
*Plaintiffs-Appellants,*

v.

ALIGN TECHNOLOGY, INC,
*Defendant-Appellee.*

─────────────────────

Appeal from the U.S. District Court for the Northern District of California
The Honorable Vince Chhabria, J. (No. 20-cv-03754; No. 21-cv-03269)

─────────────────────

**BRIEF FOR THE HONORABLE PAUL R. MICHEL (RET.)
AS AMICUS CURIAE IN SUPPORT OF
APPELLEE ALIGN TECHNOLOGY, INC. AND AFFIRMANCE**

─────────────────────

Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com

*Counsel for Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................ii

INTEREST OF AMICUS CURIAE ............................................... 1

ARGUMENT..................................................................................... 3

I.    Antitrust Law And Patent Law Both Aim To Benefit The Public Interest, And Their Goals Are More Aligned Than Typically Presented................................................................... 3

     A.    The Conventional View............................................. 4

     B.    The Complete View ................................................... 6

     C.    Why This Matters .................................................... 11

II.    The District Court's Decision Affirms The Important Role That Exclusive Patent Rights Play In Advancing Innovation And Improving Competition ........................................... 16

     A.    Refusals to Deal, in the Context of Patented Technology, Should Be Very Narrowly Circumscribed........ 16

     B.    The Ability to Defend Patent Rights Should Not Be Jeopardized by Overly Aggressive Antitrust Enforcement .................................................................. 20

III.    Responses To Certain Misplaced Arguments By The Amici ........ 22

     A.    The American Antitrust Institute Brief ................... 23

     B.    The United States Brief.......................................... 29

IV.    Conclusion ...................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
725 F.2d 1350 (Fed. Cir. 1984) ............................................................ 1

*Aerotec International, Inc. v. Honeywell International, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ....................................................... 19, 20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985) .............................................................................. 19

*Atari Games Corp. v. Nintendo of America, Inc.*,
897 F.2d 1572 (Fed. Cir. 1990) ............................................................ 12

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992) ....................................................................... 17, 20

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ......................................................................... 5, 13

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ............................................ 24, 25, 26, 27, 28

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ....................................... 2, 12, 19, 28, 32

*Image Technical Services, Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) ........................................... 12, 20, 23, 24

*In re Ciprofloxacin Hydrochloride Antitrust Litigation*,
544 F.3d 1323 (Fed. Cir. 2008) ............................................................. 1

*In re Independent Service Organizations Antitrust Litigation*,
203 F.3d 1322 (Fed. Cir. 2000) ...................................................... 1, 28

*Intergraph Corp. v. Intel Corp.*,
195 F.3d 1346 (Fed. Cir. 1999) ............................................................. 6

*Kewanee Oil Co. v. Bicron Corp.,*
 416 U.S. 470 (1974) ................................................................ 6

*Loctite Corp. v. Ultraseal Ltd.,*
 781 F.2d 861 (Fed. Cir. 1985) .......................................... 6, 7

*Mercoid Corp. v. Mid-Continent Investment Co.,*
 320 U.S. 661 (1944) .............................................................. 12

*MetroNet Services Corp. v. Qwest Corp.,*
 383 F.3d 1124 (9th Cir. 2004) ....................................... 19, 20

*Nobelpharma AB v. Implant Innovations, Inc.,*
 141 F.3d 1059 (Fed. Cir. 1998) ........................................... 1

*Oahu Gas Service Inc. v. Pacific Resources, Inc.,*
 838 F.2d 360 (9th Cir. 1988) ......................................... 20, 31

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.,*
 555 U.S. 438 (2009) .............................................................. 17

*Russian River Watershed Protection Committee v. City of Santa Rosa,*
 142 F.3d 1136 (9th Cir. 1998) ............................................ 25

*Simon and Simon, PC v. Align Technology, Inc.,*
 No. 20-cv-037540-VC, 2024 WL 710623 (N.D. Cal. Feb. 21, 2024) ... 21

*Smith v. Marsh,*
 194 F.3d 1045 (9th Cir. 1999) ............................................ 30

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.,*
 841 F.3d 827 (10th Cir. 2016) ....................................... 26, 28

*Swan v. Peterson,*
 6 F.3d 1373 (9th Cir. 1993) ................................................ 30

*Telecom Technical Services, Inc. v. Rolm Co.,*
 388 F.3d 820 (11th Cir. 2004) ............................................ 28

*United States v. Colgate & Co.,*
 250 U.S. 300 (1919) .............................................................. 17

*United States v. Line Materials Co.*,
    333 U.S. 287 (1948) .................................................................. 4

*United States v. Wahchumwah*,
    710 F.3d 862 (9th Cir. 2013) .................................................. 30

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................. 17, 18, 19

*Yu v. Apple Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021) ................................................ 13

## Constitution and Statutes

U.S. Const. art. I, § 8, cl. 8 ...................................................... 5, 6

15 U.S.C. § 2 ..................................................................................... 5

35 U.S.C. § 154(a)(1) ..................................................................... 6

## Rules

Federal Rule of Appellate Procedure 29(a)(4)(E) ...................... 1

## Other Authorities

David Kappos & Paul R. Michel, *The Smallest Salable
    Patent-Practicing Unit: Observations on its Origins,
    Development, and Future*, 32 Berkeley Tech. L.J. 1433 (2018) ........... 2

Greg Dolin, *Resolving the Patent-Antitrust Paradox: Promoting
    Consumer Welfare Through Innovation*, Geo. Mason U. Ctr. for
    Protection of Intell. Prop. (May 2013) .................................. 10

James C. Burling, et al., *The Antitrust Duty to Deal and Intellectual
    Property Rights*, 24 J. Corp. L. 527 (1999) ........................ 18

Jonathan M. Barnett, *An Unconventional View of Intellectual
    Property and Antitrust Policy*, TechReg Chronicle (Sept. 2024) ..... 4, 5

Jonathan M. Barnett, *Innovators, Firms, and Markets:
    The Organizational Logic of Intellectual Property* (2021) ........... 7, 8, 9

Kristen J. Osenga, *"Efficient" Infringement and Other Lies*,
52 Seton Hall L. Rev. 1085 (2022) ...................................................... 11

Lauren Berg, *Align, 3Shape Ink IP, Antitrust Deal Over Clear Braces*,
Law360 (Feb. 7, 2022)........................................................................ 15

Lina Khan, *Reinvigorating Antitrust: Citizens, Not Just Consumers*
(Mar. 2024) ....................................................................................... 31

Paul R. Michel & Kathleen O'Malley, *Inventors Have a Right to Sell
Their Patented Products by Blocking Copycats*,
Real Clear Policy (Mar. 29, 2023) ................................................ 12, 13

Paul R. Michel & Matthew J. Dowd, *Patent Protection:
A Crucial Antitrust Tool for Increasing Innovation*,
TechReg Chronicle (Oct. 1, 2024) ....................................................... 2

Paul R. Michel & Matthew J. Dowd, *The Need for "Innovation
Certainty" as the Crossroads of Patent and Antitrust Law*,
CPI Antitrust Chronicle (Apr. 2017)..................................................... 2

Randall R. Rader & Benjamin J. Christoff,
*Patent Law In a Nutshell* (3d ed. 2018) .............................................. 7

U.S. Department of Justice & Federal Trade Commission,
*Antitrust Guidelines for the Licensing of Intellectual Property*,
(Jan. 12, 2017)............................................................................... 17, 18

U.S. Department of Justice & Federal Trade Commission,
*Antitrust Enforcement and Intellectual Property Rights:
Promoting Innovation and Competition* (Apr. 2007).......................... 18

## INTEREST OF AMICUS CURIAE

The Honorable Paul R. Michel (ret.) served on the Federal Circuit for over twenty-two years. From 2004 until his retirement in May 2010, he was the chief judge of the court. During his twenty-two years of judicial service, he heard thousands of appeals and authored over 800 opinions, touching on all aspects of the court's jurisdiction, including patent law.[1]

While Judge Michel's work on the Federal Circuit is often linked to patent law, the Federal Circuit has regularly confronted complex antitrust issues. *See, e.g.*, *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 544 F.3d 1323 (Fed. Cir. 2008); *In re Indep. Serv. Orgs. Litig.*, 203 F.3d 1322 (Fed. Cir. 2000); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998). From its inception, the Federal Circuit has tackled issues at the interface between antitrust and patent law. *See, e.g.*, *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed. Cir. 1984).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), no party's counsel authored this brief in whole or in part; no person or entity, other than Judge Michel and his counsel, contributed monetarily to this brief; and all parties have consented to its filing.

Since he retired from the Federal Circuit, Judge Michel has maintained an active role in the public dialogue about optimal policies governing intellectual property and U.S. innovation. He has authored or co-authored numerous articles touching on the innovation policy. *See, e.g.*, Paul R. Michel & Matthew J. Dowd, *Patent Protection: A Crucial Antitrust Tool for Increasing Innovation*, TechReg Chronicle (Oct. 1, 2024); David Kappos & Hon. Paul R. Michel, *The Smallest Salable Patent-Practicing Unit: Observations on its Origins, Development, and Future*, 32 Berkeley Tech. L.J. 1433 (2018); Paul R. Michel & Matthew J. Dowd, *The Need for "Innovation Certainty" at the Crossroads of Patent and Antitrust Law*, CPI Antitrust Chronicle (Apr. 2017). Judge Michel has also been invited to testify before Congress on substantive patent law issues that are critical to the Nation's economic health.

Particularly relevant to the current appeal, Judge Michel submitted an amicus curiae brief in *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020). In that brief, Judge Michel argued in part against eroding the U.S. patent system and its crucial incentives to innovate through the unnecessary extension of antitrust law. The Court's opinion favorably cited Judge Michel's amicus brief. *Id.* at 997, 999 n.20.

Judge Michel is one of the nation's leading patent law experts, having a unique combination of judicial experience, legal expertise, and the total absence of any financial conflicts of interest. He is currently a board member for Council for Innovation Promotion ("C4IP")[2] and for Inventors Defense Alliance,[3] among several other organizations.

His sole objective is to respectfully share his perspective as a true friend of the court to ensure that the U.S. patent system creates the optimal incentives for inventors, innovators, and investors—as it has traditionally done. Judge Michel also offers his perspective on the present appeal to ensure that the U.S. innovation ecosystem remains competitive in the global marketplace.

## ARGUMENT

## I. Antitrust Law And Patent Law Both Aim To Benefit The Public Interest, And Their Goals Are More Aligned Than Typically Presented

The conventional wisdom frequently treats patent law and antitrust law (under the Sherman Act and other statutes) as existing in irreconcilable, conflicting tension. This conventional dichotomy flows

---

[2] https://c4ip.org.

[3] https://inventorsdefense.org.

through the reasoning and dicta of many cases, as well as volumes of law journals. But that view is too simplistic, and when we look past the simplistic view, we see that patents frequently provide a pro-competitive effect, benefitting consumer welfare and competition in the near- to mid-term, even while the patentee enjoys his or her exclusive right over the invention. Any dispute, including the present one, should account for the complementary and aligned roles of patent and antitrust law when ruling on a dispute that affects companies' innovation.

## A.    The Conventional View

The conventional view sees antitrust law and patent law at odds and in tension with each other. *See, e.g.*, *United States v. Line Materials Co.*, 333 U.S. 287, 310 (1948) ("We are thus called to make an adjustment between the lawful restraint on trade of the patent monopoly and the illegal restraint prohibited broadly by the Sherman Act."); *see also* Jonathan M. Barnett, *An Unconventional View of Intellectual Property and Antitrust Policy*, TechReg Chronicle at 3 (Sept. 2024) ("The conventional view assumes an inherent tension between innovation policy, which values IP rights as a mechanism to incentivize R&D investment, and competition policy, which views IP rights as a monopoly entitlement that

raises entry costs and drives a wedge between price and marginal cost."). Of course, this conventional view is somewhat understandable, especially when the two areas of law are viewed in their separate silos.

The Sherman Act stemmed from Congress's valid concerns about the robber barons of the oil, steel, and railroad industries of the late nineteenth century. Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize." 15 U.S.C. § 2. Congress did not provide much guidance about the precise scope of the Sherman Act, so it was left to the courts for further refinement.

In contrast to the Sherman Act, patent law is rooted in the Constitution, with it being the only personal right enumerated in the original Constitution. *See* U.S. Const. art. I, § 8, cl. 8. The First Congress recognized the importance of patents when it enacted the Patent Act of 1790. *See also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) ("From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases.").

The conventional view of patents is that their primary means to incentivize innovation is the grant of an exclusive right. *See* U.S. Const. art. I, § 8, cl. 8 ("To promote the Progress of . . . useful Arts, by securing for limited Times to . . . Inventors the exclusive Right to their . . . Discoveries."); 35 U.S.C. § 154(a)(1) (mandating that every patent contains "a grant to the patentee" "of the right to exclude others from making, using, offering for sale, or selling the invention"). As the Supreme Court has explained, "[t]he patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often-enormous costs in terms of time, research, and development." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480 (1974).

### B. The Complete View

This conventional view of patents is not necessarily wrong, but it is incomplete. A more complete understanding recognizes that "[t]he patent and antitrust laws are complementary, the patent system serving to encourage invention and the bringing of new products to market by adjusting investment-based risk, and the antitrust laws serving to foster industrial competition." *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999) (citing *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861,

866–67 (Fed. Cir. 1985)).  But even that characterization from the Federal Circuit twenty-five years ago does not fully appreciate the market-dynamic function of patents.

Specifically, patents facilitate monetary capitalization, which can then promote commercialization.  This process is important across a range of industries, including small to medium-sized enterprises ("SMEs") that focus on innovation, as well as larger enterprises in the biotechnology, pharmaceutical, medical diagnostics, and medical device areas.  Fortunately, there is a growing recognition of a patent's important role in post-grant capitalization, licensing, manufacturing, and commercialization activities.  *See generally* Jonathan M. Barnett, *Innovators, Firms, and Markets: The Organizational Logic of Intellectual Property* (2021); *see also* Randall R. Rader & Benjamin J. Christoff, *Patent Law in a Nutshell* 10–11 (3d ed. 2018) ("The incentives of patent law do some of their best work after invention, disclosure, and issuance of a patent.  At that point, the patent system enables an inventor to raise capital to market and manufacture the invention.").[4]

---

[4] The Honorable Randall R. Rader (ret.) is the former sixth Chief Judge of the U.S. Court of Appeals for the Federal Circuit.

To begin, patents can reduce transaction costs between entrepreneurial SMEs and larger, more established corporations. Robust, reliable patent grants enable innovative SMEs to share their innovations (through licensing) with more established companies that are better structured to commercialize the innovations. The patents provide reasonable assurance to the innovative SME that the large corporations who want to expropriate the SME's innovations will pay a fair price. As the certainty in patent protection decreases, however, the transaction costs for innovative SMEs increase because they need to be more cautious with disclosing their innovation.

Second, patent protection also reduces financing costs for innovative SMEs. As detailed by Professor Jonathan Barnett, "IP rights can reduce financing costs incurred by an entrepreneurial firm that wishes to integrate forward into some or all commercialization functions without relying on the infrastructures, reputational capital, and scale economics of an existing dominant firm." Barnett, *Innovators, Firms, and Markets*, *supra*, at 38. In other words, even after an invention is described and disclosed in a patent, the exclusive right of a patent enables SMEs to grow into larger, more integrated companies with commercialization

and/or manufacturing capabilities, thus expanding consumer choice in the marketplace and enhancing competition.

When patents are understood to be a tool for facilitating licensing, manufacturing, and other commercialization activities, it is easier to understand why larger, more established companies in many industries no longer favor strong patent protection—and why patents are so important for smaller, new market entrants to be competitive. In many industries (even many technology-intensive industries, with the pharmaceutical and biotech industries being notable exceptions), "larger firms tend to have lower-cost access to non-patent mechanisms for extracting returns from innovations." Barnett, *Innovators, Firms, and Markets*, *supra*, at 139. Said differently, larger corporations can rely on their market dominance and vertically integrated structures to ensure reasonable financial returns on their R&D efforts. Smaller firms lack that market dominance and vertical integration, and they risk being overpowered by larger, established firms if they introduce their innovation into the market without reliable patent protection.

Moreover, some larger firms (such as in the tech space) do not need to rely on patents to facilitate capitalization and commercialization.

They already have ready access to the capital markets, usually through public stock markets. They also typically have internal means of commercializing their products (unlike SMEs), through vertical integration of manufacturing, retail, marketing, and other commercialization capabilities.

When viewed this way, patents are easily seen as an effective antitrust tool. *See, e.g.*, Greg Dolin, *Resolving the Patent-Antitrust Paradox: Promoting Consumer Welfare Through Innovation*, Geo. Mason U. Ctr. for Protection of Intell. Prop., May 2013, at 2 ("Whereas antitrust law seeks to promote competition mostly on price, patents promote competition by incentivizing new innovation, product differentiation, manufacturing and process innovations, and influencing consumer tastes.").[5] Reliable patent protection can enable the disruption of entrenched and established firms by giving leverage to new innovators who will have a lower fear of free riding or expropriation. If, however, patent protection is unreliable and there is no reasonable chance of preventing infringing activity, the market-dominant companies will continue their predatory-

---

[5] https://cip2.gmu.edu/wp-content/uploads/sites/31/2013/08/Dolin-Patent-Antitrust-Paradox.pdf.

infringement activities.  *See, e.g.*, Kristen Jakobsen Osenga, *"Efficient" Infringement and Other Lies*, 52 Seton Hall L. Rev. 1085, 1089 (2022) ("'Efficient' infringement, or choosing to infringe another's patent instead of negotiating and accepting a license first, is only a rational course of action when the infringer will not later be enjoined from using the patented technology.").

Large, market-dominant companies that do not rely on patent protection—think software companies, for example—and instead engage in predatory infringement can do so with little risk of near-term liability because courts, under current case law, are far less likely to issue injunctions to stop infringing activity.  Moreover, any court-ordered compensation is typically years down the road, allowing the infringer to seize increasing market share using expropriated technologies.

### C.    Why This Matters

Fully appreciating how the complementary roles of patent law and antitrust law improve consumer welfare is critical to reaching the correct, balanced decision in any case involving a refusal to deal in the context of intellectual property rights.  Accordingly, in an effort to maximize the public benefits afforded by both antitrust and patent law, courts must be

careful to strike a balance between antitrust law's restrictions on illegal anticompetitive behavior and the right to exclude afforded by patent law.

Indeed, the Ninth Circuit has explained that the "primary interest of both intellectual property and antitrust law" is the "public interest." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1218 (9th Cir. 1997) (citing *Mercoid Corp v. Mid-Continent Inv. Co.*, 320 U.S. 661, 665 (1944)); *see also FTC v. Qualcomm Inc.*, 969 F.3d 974, 988 (9th Cir. 2020) ("Antitrust law, like patent law, is 'aimed at encouraging innovation, industry, and competition.'" (quoting *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1576 (Fed. Cir. 1990))).

To achieve the balance, though, courts and litigants must recognize that a decision to enforce a patent against a suspected infringer has become extraordinarily complex in recent years. Over the past decade and a half, patent law has radically changed, and not in a way that benefits innovation. Shifting laws have, by and large, weakened the patent grant. *See, e.g.*, Paul Michel & Kathleen O'Malley, *Inventors Have a Right to Sell Their Patented Products by Blocking Copycats*, Real Clear Policy (Mar. 29, 2023) (detailing how, "in cases where a patent owner proves infringement—even when it is manifestly intentional—injunctions are

significantly less common than they were before" *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)).[6] Legal decisions from the Supreme Court and the Federal Circuit have also made it far more difficult to determine if an invention is even "patent-eligible subject matter." *See, e.g.*, *Yu v. Apple Inc.*, 1 F.4th 1040, 1045–46 (Fed. Cir. 2021) (affirming that a patent claim to a digital camera was directed to an "abstract idea" and therefore invalid).

Additionally, the adversarial post-grant revocation proceedings created by the America Invents Act of 2011 established a new administrative path for an infringer to challenge a patent, thus placing a cloud over any patent being litigated. Not surprisingly, several of Align's patents that were asserted against 3Shape were also subject to post-grant AIA challenges filed by 3Shape.[7] It has unfortunately become fairly typical

---

[6] The Honorable Kathleen O'Malley is a retired circuit judge of the U.S. Court of Appeals for the Federal Circuit.

[7] *See 3Shape A/S v. Align Tech., Inc.*, Nos. IPR2019-00132, IPR2019-00134, IPR2019-00148 through IPR2019-00157, IPR2019-00159, IPR2019- 00160, IPR2019-00163, IPR2020-00173, IPR2020-00174, IPR2020-00222, IPR2020-00223, IPR2020-01622, IPR2020-01642, IPR2020-01643, IPR2020-01644, IPR2020-01645, IPR2021-01120, IPR2021-01240, IPR2021-01241, IPR2021-01323, and IPR2021-01383 (P.T.A.B. filed in 2019, 2020, and 2021). Here, it appears that the large

for an accused infringer to separately challenge a patent in an AIA proceeding after being sued for patent infringement in district court. That dual-forum approach to challenging patents increases uncertainty for patent owners and effectively adds to the cost of innovation and competition.

In this current environment, innovators must tread carefully when trying to avoid the arsenal of potential defenses that an accused infringer might assert. Despite the complexity, decisions to enforce and protect patents should almost always be seen as a legitimate business reason, absent a sham litigation or a fraudulently obtained patent. Courts should want to avoid legal tests that delve into the "intent" of the patent owner, as that could well force patent owners to abandon reasonable business-based judgments that protect the exclusive grant of a patent.

Another important consideration for courts when assessing the proper reach of the Sherman Act is the recognition that reliable patent protection and enforcement enables private parties to settle their dis-

---

majority of Align's patent claims were confirmed as patentable, despite 3Shape's multiple attempts to cancel the patents.

putes with certainty.  When competitors can privately resolve their disputes over patented technology, that outcome benefits consumers in the vast majority of cases.  The alternative is to force courts to become policy makers.  In the present disputes, despite the wide-ranging litigation, Align and 3Shape were eventually able to settle the dispute.  *See* Lauren Berg, *Align, 3Shape Ink IP, Antitrust Deal Over Clear Braces,* Law360 (Feb. 7, 2022).  If the district court's decision is overturned, then the reversal will only encourage similar litigation.

Certain groups and academics prefer weaker patent protection in favor of more vigorous enforcement of the antitrust laws as a means to encourage competition.  But that approach is problematic for numerous reasons.  It fails to account for the complete role of patent rights in advancing innovation and increasing consumer welfare.

In sum, the application of any antitrust framework must properly account for the exclusive right granted to innovators and inventors and how that exclusive right promotes consumer welfare and competition, particularly for SMEs and larger biotech, pharma, and medical-device companies.  Not only must the decisionmaker account for the exclusive right—rooted in the Constitution—but he or she must also guard against

the overly aggressive enforcement of the Sherman Act, as that approach would effectively stifle formation of innovative firms and discourage investments in such firms.

## II. The District Court's Decision Affirms The Important Role That Exclusive Patent Rights Play In Advancing Innovation And Improving Competition

The district court's grant of summary judgment in favor of Align appears to reflect an accurate understanding of the procompetitive nature of the patent owner's right to exclude, as well as the accepted understanding that refusal-to-deal claims cannot be allowed to trump patent rights, absent exceptional circumstances. Specifically, the enforcement of patent rights as a valid business justification is presumptively valid and cannot be lightly rebutted. A patent owner's decisions when enforcing their patent rights—or taking actions in response to expected attacks on one's patents—should be afforded elevated deference in an antitrust analysis.

### A. Refusals to Deal, in the Context of Patented Technology, Should Be Very Narrowly Circumscribed

As a general matter, courts have generally recognized that patent owners possess a unique exception to typical antitrust principles, as a

patent owner has traditionally had the right to exclude others from infringing his or her patent. *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (recognizing that, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal'" (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919))); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 n.32 (1992) (noting that, "as a general matter a firm can refuse to deal with its competitors," on the condition that the firm earn this "right" by proffering "legitimate competitive reasons for the refusal").

While agencies have waxed and waned with their interpretations and applications of the Sherman Act over the years, they have generally agreed that the exercise of a valid patent right generally cannot create liability under antitrust law. *See* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* 3

(Jan. 12, 2017) ("The antitrust laws generally do not impose liability upon a firm for a unilateral refusal to assist its competitors, in part because doing so may undermine incentives for investment and innovation."); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* 32 (Apr. 2007) ("[A]ntitrust liability for mere unilateral, unconditional refusals to license patents will not play a meaningful part in the interface between patent rights and antitrust protections.").

The overarching concern is that compelling parties to transact business with competitors will require "courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited." *Trinko*, 540 U.S. at 407–08. That concern is magnified exponentially when the refusal to deal is linked to complex patent considerations, such as patent enforcement and litigation. *See, e.g.*, James C. Burling, et al., *The Antitrust Duty to Deal and Intellectual Property Rights*, 24 J. Corp. L. 527, 552 (1999) ("Addressing unilateral refusals to deal involving patent rights or copyrights requires insight both into the purposes animating the intellectual property and antitrust laws, and

- 18 -

into the types of intellectual property concerns that are likely to arise in a rapidly advancing technological society.").

Of course, "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2" of the Sherman Act. *Trinko*, 540 U.S. at 408. But "there is only a duty not to refrain from dealing where the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) (quoting *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132 (9th Cir. 2004)). A refusal to deal is not unlawful unless plaintiffs are able to prove "anticompetitive abuse or leverage of monopoly power, or a predatory or exclusionary means of attempting to monopolize the relevant market." *Qualcomm,* 969 F.3d at 990. This is a "limited exception," and, as the Supreme Court has explained, the exception applied in *Aspen Skiing v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), is "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409 (citing *Aspen Skiing*, 472 U.S. at 608, 610–11)).

Importantly, "[w]hen a legitimate business justification supports a monopolist's exclusionary conduct, that conduct does not violate § 2 of the Sherman Act." *Kodak*, 125 F.3d at 1212 (citing *Kodak*, 504 U.S. at 483; *Oahu Gas Serv. Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368 (9th Cir. 1988)); *MetroNet*, 383 F.3d at 1133 (finding a refusal to deal justified where defendant was "presumably maximizing . . . profits"); *Aerotec*, 836 F.3d at 1184 (finding a refusal to deal justified as it was "an independent decision on terms of dealing with a competitor"). Once a defendant proffers a pro-competitive justification, the plaintiff has the burden to prove that the justification is pretextual or that the defendant acquired the protection of the intellectual property laws in an unlawful manner. *Kodak*, 125 F.3d at 1218–19.

## B. The Ability to Defend Patent Rights Should Not Be Jeopardized by Overly Aggressive Antitrust Enforcement

One issue presented in this case is whether Align's decision to terminate the interoperability agreement was a presumptively valid business justification. The district court's grant of summary judgment appears to reach the correct conclusion in the context of the protracted patent litigation between Align and 3Shape.

There appears to be no dispute that Align and 3Shape were embroiled in a widespread, presumably contentious patent litigation concerning 3Shape's allegedly infringing intraoral scanners. As the district court noted, Align believed that 3Shape's scanner technology infringed "numerous patents." *Simon & Simon, PC v. Align Tech., Inc.*, No. 20-cv-03754-VC, No. 21-cv-03269-CV, 2024 WL 710623, at *1 (N.D. Cal. Feb. 21, 2024). The litigation was spread across four different jurisdictions, in Delaware, in Texas, at the U.S. International Trade Commission, and, as noted above, before the U.S. Patent and Trademark Office with 3Shape's multiple post-grant (and mostly unsuccessful) challenges to Align's patents. Without exploring the specifics of the infringement claims and various defenses, it is abundantly clear that the Align-3Shape patent litigation was far from a run-of-the-mill patent dispute.

On top of that, there appears to be no genuine factual dispute that Align terminated the interoperability agreement because of, at least in part, Align's concerns about some of the equitable infringement defenses that 3Shape might raise—and in fact did raise—in the infringement litigations. *Id.* ("[T]he defenses Align anticipated were indeed asserted.").

To any experienced patent-law practitioner, Align's attempt to neutralize a potential defense of an accused infringer is an entirely rational decision. And it is difficult to imagine that antitrust law should be construed and applied in a way that requires courts and juries to second-guess plainly rational litigation strategies. Such an approach could plant a seed of doubt in the mind of any innovator facing challenging choices of protecting its intellectual property from infringers.

For these reasons, the district court correctly relied on the presumptive validity of Align's action to protect its patent rights. To do anything else would require the court (or the jury) to delve into a subjective analysis of the strengths and weaknesses of 3Shape's equitable defenses to patent infringement. That reasoning appears to be consistent with this Court's precedent and a correct appreciation of how patents protect innovation and are often necessarily enforced through litigation.

## III. Responses To Certain Misplaced Arguments By The Amici

Two amicus briefs were filed in support of Appellants. Certain assertions and arguments made in those briefs are worth addressing to ensure that the Court has the benefit of the more complete picture of how

patents enhance competition and consumer welfare and are used by businesses and investors to advance competition.

## A.    The American Antitrust Institute Brief

Not surprisingly, the American Antitrust Institute ("AAI") advocates for a particularly aggressive application of the Sherman Act.  The Court should reject many of AAI's positions.  Amicus addresses three specific contentions in AAI's brief.

*First*, AAI asserts that "[t]he district court began with a definition of what is 'presumptively valid' that incorrectly focuses on the patent litigation as a whole rather than the decision to terminate interoperability." AAI Br. 7.  AAI's premise misunderstands patent enforcement, patent litigation, and the role of potential defenses an accused infringer may assert in patent litigation.

To start, AAI acknowledges in its amicus brief that the straightforward justification of protecting one's patents from infringement is presumptively valid.  *Id.* at 8 (noting that the defendant's justification in *Kodak* was "straightforward: protecting its patents from infringement"). With that much Amicus agrees.  But AAI then argues that the presumptively valid standard should not be understood to reach far enough to

- 23 -

cover Align's decision to neutralize 3Shape's equitable defenses to patent infringement. *Id.* at 8–10.

AAI relies on a distinction without a difference, as patent protection and patent litigation are so inextricably intertwined that it is not possible to make a meaningful distinction for purposes of assessing the "presumptive validity" assessment. AAI incorrectly claims that "Align does not argue, as Kodak did, that termination was necessary to protect its patent from infringement." *Id.* at 8. That is precisely Align's argument, when correctly understood in the context of patent litigation. Any reasonable and rational patent owner will take actions to protect the strength of its intellectual property, and that includes taking actions that might negate an infringer's potential infringement defenses. An action that defeats an infringer's defense is little different than an action taken to enforce a patent right.

Within its attack on the "presumptively valid" analysis, AAI also takes aim at the "scope-of-the-patent" test and how the Supreme Court addressed that issue in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013). *See* AAI Br. 10–11. AAI's analysis relies heavily on misreading *Actavis* as "direct Supreme Court scrutiny" of the scope-of-the-patent test as a

whole. *Id.* at 10–12. Amicus respectfully submits that AAI's reliance on *Actavis* is misplaced.

To start, neither Appellants nor Appellee cites *Actavis* in their briefs, let alone invokes the argument pressed by AAI. It appears that AAI, as an amicus, is the only entity pressing it, and thus the Court need not and should not reach AAI's argument. *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998) (declining to address an argument because, "as [amicus curiae] candidly acknowledges, it is raised for the first time on appeal, and not by any party").

More fundamentally, AAI's argument appears to stretch *Actavis* beyond its facts. Unlike the present matter, *Actavis* involved an analysis of whether a reverse-payment settlement violated § 1 of the Sherman Act. 570 U.S. at 140–47. The Supreme Court described a reverse-payment settlement as a settlement that "requires the patentee to pay the alleged infringer, rather than the other way around" which "would normally suggest that the patentee has serious doubts about the patent's survival." *Id.* at 141, 157. The Supreme Court ultimately found that reverse-payment settlements "can sometimes violate the antitrust laws." *Id.* at 141.

In *Actavis*, the Supreme Court did not attack the concept of the scope-of-the-patent test in all instances, as AAI seemingly alludes. AAI Br. 11 (claiming that "[t]he Court explained that the 'scope of the patent' test goes awry by measuring 'anticompetitive effects solely against patent law policy'"). Rather, the Supreme Court determined that, even though the anticompetitive effects fell within the patent's exclusionary scope, the scope-of-the-patent test was inapplicable to *the specific facts* of the reverse-payment settlement at issue. *Actavis*, 570 U.S. at 147–48 ("Given these factors, it would be incongruous to determine antitrust legality by measuring the settlement's anticompetitive effects solely against patent law policy.").

Further, the Supreme Court did not provide any indication in *Actavis* that its analysis of a § 1 reverse-payment settlement should extend to a § 2 refusal-to-deal case. Nor does AAI point to any language in *Actavis* that might support its attempt to broadly expand the reach of the decision. AAI Br. 10–11. Notably, the Tenth Circuit has held that the circumvention of the scope-of-the-patent test in *Actavis* is not applicable to refusal-to-deal cases. *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 843 n.7 (10th Cir. 2016) (stating that the plaintiff's reliance on

*Actavis* was misplaced because "*Actavis* was a § 1 case involving potentially collusive behavior among competitors" that "did not address the rationality of a defendant's stated business justification for purposes of a § 2 unilateral refusal-to-deal claim").

Accordingly, AAI overreads *Actavis* when it asserts that the Court "firmly rejected a test it feared would immunize a broad swath of potentially anticompetitive activity under the guise of patent enforcement." AAI Br. 11. It would be much more accurate to say that the *Actavis* majority recognized that, in some instances, particularly in a reverse-payment settlement scenario in which there may be no valid patent protection, the scope-of-the-patent test is inapplicable. None of the factors identified in *Actavis* is found in the facts of the present matter. The majority's conclusion in *Actavis* can only be reasonably read as stating a limit to the scope-of-the-patent test that is narrowly focused on reverse-payment settlements, and without any consideration of whether its holding applies more broadly to § 2 generally or to refusal-to-deal claims more specifically.

Moreover, the *Actavis* dissent's warnings are further reason to reject AAI's overreading of the majority opinion. As Chief Justice Roberts's

dissent observed: "The majority points to *no* case where a patent settlement was subject to antitrust scrutiny merely because the validity of the patent was uncertain. Not one." *Id.* at 167 (emphasis in original). With that absence of precedential support, it is difficult to see how the majority opinion can or should be understood to extend to other factual scenarios. Such a reach would further "depart[] from the settled approach separating patent and antitrust law" and further "weaken[] the protections afforded to innovators by patents." *Id.* at 176 (Roberts, C.J., dissenting).

*Second*, AAI argues that the district court "wrongly imported a 'sham' standard for any rebuttal," as opposed to a showing of pretext. AAI Br. 8. It appears that this issue need not be addressed, as the judgment should be affirmed if applying the objective standard set forth in *Qualcomm*, 969 F.3d at 993–94. Also, although it seems unnecessary here, if the full Court were inclined, it could reconsider its subjective "pretext" standard so as to align its refusal-to-deal analysis with the objective standards of other courts. *See SOLIDFX*, 841 F.3d at 842–43; *Telecom Tech. Servs. Inc. v. Rolm Co.*, 388 F.3d 820, 826–27 (11th Cir. 2004); *In re Indep. Serv. Orgs.*, 203 F.3d at 1327 (applying Tenth Circuit law).

Avoiding a subjective test would sharpen the analysis with more predictable outcomes, thus advancing the goal of promoting both competition and innovation.

*Third*, Amicus disagrees with AAI's contention that "this case offers an opportunity for this Court to provide a much-needed clarity to district courts on how to assess refusals to deal." AAI Br. 14. AAI's request could well invite specious refusal-to-deal claims that would further undermine intellectual property laws and would leave innovators who pursue reasonable patent-enforcement actions—to stop potential infringers—subject to expensive and disruptive antitrust litigation. While AAI may be advancing its sincere belief that antitrust law should be the dominant legal framework for protecting competition, that view not only overlooks the recent scholarship of Professor Barnett and others, but it also does not adequately account for the nuanced decisionmaking that innovators and their investors must undertake when deciding to protect their innovation-based investments.

## B.    The United States Brief

Amicus addresses one point raised by the Government's amicus brief, which contends that the district court misapplied this Court's

mixed-motive framework. The Court should reject that argument for several reasons.

First, in an unusual move, the Government presses an argument that no party raises on appeal. As such, the Government's argument should not be the basis for deciding the case. *E.g.*, *Swan v. Peterson*, 6 F.3d 1373, 1383 (9th Cir. 1993); *see also United States v. Wahchumwah*, 710 F.3d 862, 865 (9th Cir. 2012) ("Generally, we do not consider on appeal an issue raised only by an amicus." (citing *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999))).

Second, the Government's position on the mixed-motive framework would make it far, far easier to allege and litigate refusal-to-deal claims. That is precisely the opposite of what is required under this Court's settled precedent. It is also not what innovators, inventors, and their investors need. Expanding the availability of refusal-to-deal claims, as the Government seemingly desires, would add to the considerable legal uncertainty that currently casts a shadow over the innovation ecosystem.

Indeed, in the context of the present appeal, the Government's proffered framework—exploring whether the patent-related business justification was the "predominant" or "primary" purpose, U.S. Br. 25—would

effectively expose patent owners to a radically expanded refusal-to-deal framework. Moreover, the Government's position appears inconsistent with this Court's precedent. *See, e.g.*, *Oahu Gas*, 838 F.2d at 368.

Finally, it seems unusual for the Government to weigh in as amicus and press an argument that no party has raised in the appeal. Perhaps the Government will find a proper case for raising its issue, but it is worth noting that the Government's atypical advocacy here may be the product of the overly aggressive antitrust approach of the current administration. For instance, in remarks in March 2024 during a presentation titled *Reinvigorating Antitrust: Citizens, Not Just Consumers*, Commissioner Lina Khan stated that "[t]his administration has been incredibly clear-eyed about the need to revisit outdated assumptions and theories" and "at the heart of it is an antimonopoly vision of the role of fair competition."[8]

Indeed, the current administration's attempts to "revisit" so-called "outdated assumptions" appear intended to continue the weakening of

---

[8] https://cepr.org/system/files/2024-04/Competition%20Pol-icy%20RPN%20Webinar%20_%20Reinvigorating%20Antitrust%20Citi-zens%2C%20not%20just%20Consumers%20_%2025%20March%202024_%20Transcript.pdf

U.S. patent rights.  Whether that policy prevails will likely be decided by legislators, as it should be, but the administration's expansive antitrust policy desires ought not be the reason for the Government to press its overly aggressive interpretation when the issue is not before this Court.

## IV.  Conclusion

Ultimately, as Amicus argued earlier, "it would be a mistake to use 'the hammer of antitrust law . . . to resolve FRAND disputes when more precise scalpels of contract and patent law are effective.'"  *Qualcomm*, 969 F.3d at 997 (quoting Amicus Curiae Br. of The Honorable Paul R. Michel (Ret.) at 23).  Here, creating similar concerns, the refusal-to-deal claims are seemingly being asserted to second-guess a leading innovator's reasonable decision to protect its ability to enforce its patents.  Antitrust law should not play the role of Monday morning quarterback to reasonable patent-enforcement decisions.

Accordingly, Amicus Curiae the Honorable Paul R. Michel (ret.) respectfully submits that the district court's decision should be affirmed.


Date: October 28, 2024             Respectfully submitted,

                                   */s/ Matthew J. Dowd*

Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com

*Counsel for Amicus Curiae*
*Hon. Paul R. Michel (ret.)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-1703, 24-1783

I am the attorney or self-represented party.

**This brief contains** | 6,071 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [_____].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Matthew J. Dowd | **Date** | 10/28/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**  *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Case Management System on October 28, 2024. All participants in the case are registered ACMS users, and service will be accomplished by the Appellate Case Management System.

_/s/ Matthew J. Dowd_
Matthew J. Dowd
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com

Dated: October 28, 2024