**Nos. 24-1703, 24-1783**

# In the United States Court of Appeals for the Ninth Circuit

SIMON AND SIMON, PC; VIP DENTAL SPAS,
*Plaintiffs-Appellants*

v.

ALIGN TECHNOLOGY, INC.,
*Defendant-Appellee*

MISTY SNOW et al.,
*Plaintiffs-Appellants*

v.

ALIGN TECHNOLOGY, INC.,
*Defendant-Appellee*

*On Appeal from the
United States District Court for the Northern District of California
Civ. Nos. 20-3754 & 21-3269 (Hon. Vince Chhabria)*

**BRIEF OF *AMICUS CURIAE*
GREGORY J. WERDEN
IN SUPPORT OF AFFIRMANCE**

GREGORY J. WERDEN
*1029 N. Stuart St. #310
Arlington, VA 22201
703-527-5128
gregwerden@gmail.com*

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................... i

TABLE OF AUTHORITIES ................................................. ii

INTEREST OF *AMICUS CURIAE* .................................... 1

ISSUE PRESENTED ........................................................ 1

STATEMENT ................................................................. 2

SUMMARY OF ARGUMENT ......................................... 4

ARGUMENT .................................................................. 4

I.  Refusal-to-Deal Claims under Section 2 of the Sherman Act
Should Be Subject to the "No Economic Sense" Test ............... 7

  A. This Court Has Adopted the "No Economic Sense" Test .................... 8

  B. Other Circuits Have Adopted the "No Economic Sense" Test .......... 11

  C. How the "No Economic Sense" Test Works ...................................... 13

  D. The Seventh Circuit Misconstrued Section 2
When it Rejected the "No Economic Sense" Test ............................. 16

II.  These Cases Raise No Issues Relating
to a Defendant's Rebuttal Burden ......................................... 18

  A. These Cases Are Not Subject to the Rule of Reason,
So Burdens Are Allocated and Calibrated Differently ..................... 18

  B. The District Court Properly Held that Align Tech
Showed that Plaintiffs Failed to Raise a Triable Issue ...................... 21

  C. The District Court Properly Limited the
Inquiry into Subjective Motivation ................................................. 25

CONCLUSION ............................................................. 27

CERTIFICATE OF COMPLIANCE ............................... 28

CERTIFICATE OF SERVICE ......................................... 29

i

# TABLE OF AUTHORITIES

Cases:                                                                    Page

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
  836 F.3d 1171 (9th Cir. 2016) .................................................... 7, 22

*Allied Orthopedic Appliances Inc. v. Tyco Health
  Care Group LP*, 592 F.3d 991 (9th Cir. 2010)................................. 20

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183, (2010) .......................................................... 18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)........................................................... 5–7

*Bd. of Trade of the City of Chi. v. United States*,
  246 U.S. 231 (1918) .......................................................... 19

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008) ................................................. 21

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)........................................................... 18

*Dreamstime. com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022)............................................... 4, 20

*E. States Retail Lumber Dealers' Ass'n v. United States*,
  234 U.S. 600 (1914) .......................................................... 4, 7

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)......................................................... 22–23

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023).................................................. 19

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................. 8, 18–21

*Foremost Pro Color v. Eastman Kodak Co.*,
  703 F.2d 534 (9th Cir. 1983).............................................. 17, 20

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  903 F.2d 612 (9th Cir. 1990)................................................. 23

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  125 F.3d 1195 (9th Cir. 1997)............................................. 19, 25

Cases—Continued:                                                          Page

*In re Greene*,
    52 F. 104 (C.C. S.D. Ohio 1892) ......................................17

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015)....................................15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)....................................................15

*MetroNet Servs. Corp. v. US West Commc'ns*,
    329 F.3d 986 (9th Cir. 2003)........................................ 24

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004)...................................... 24

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ................................1, 11–13

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*,
    838 F.2d 360 (9th Cir. 1988) ........................ 9–10, 19, 26

*Pac. Bell Tel. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...............................................5, 20

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
    8 F.4th 479 (6th Cir. 2021) ...........................................12

*Simon and Simon, PC v. Align Tech., Inc.*,
    533 F. Supp. 3d 904 (N.D. Cal. 2021) ............................ 3

*Snow v. Align Tech., Inc.*,
    586 F. Supp. 3d 972 (N.D. Cal. 2022)............................ 3

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) .........................................6, 16–17

*Standard Oil Co. of N.J. v. United States*,
    221 U.S. 1 (1911) .....................................................17

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997).....................................................19

*Trace X Chem., Inc. v. Canadian Indus., Ltd.*,
    738 F.2d 261 (8th Cir. 1984) ....................................11, 19

Cases—Continued:                                                                Page

    *United States v. Colgate & Co.*,
      250 U.S. 300 (1919) ............................................................ 4

    *United States v. Microsoft Corp.*,
      253 F.3d 34 (D.C. Cir. 2001) (en banc) ............................ 22

    *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*,
      914 F.2d 1256 (9th Cir. 1990) (per curiam) ..................... 10

    *Verizon Commc'ns, Inc. v. Law Offices of*
      *Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) ...................... 5, 7, 16, 20

    *Viamedia, Inc. v. Comcast Corp.*,
      951 F.3d 429 (7th Cir. 2020) ........................................ 1, 16

    *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
      549 U.S. 312 (2007) ...................................................... 20

    *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*,
      668 F.2d 1014 (9th Cir. 1981) ........................................ 9

Statutes:

    15 U.S.C. § 1 ................................................................... 19

    15 U.S.C. § 2 ............................................................... *passim*

Miscellaneous:

    Areeda, Phillip E., & Herbert Hovenkamp,
      *Antitrust Law* (3d ed. 2008) ........................................ 13

    Edmunds, George F. & George F. Hoar, Remarks
      21 Cong. Rec. 3151–52 (1890) ..................................... 16–17

    Hovenkamp, Erik, *The Antitrust Duty to Deal*
      *in the Age of Big Tech*, 131 Yale L.J. 1483 (2022) ........... 14

    United States & FTC, Brief as Amici Curiae Supporting Petitioner,
      *Trinko*, 540 U.S. 398 (2004) (No. 02-682) ...................... 7

    Werden, Gregory J., *Identifying Exclusionary Conduct*
      *Under Section 2: The "No Economic Sense" Test*,
      73 Antitrust L.J. 413 (2006) ......................................... 13

## INTEREST OF *AMICUS CURIAE*[1]

Gregory J. Werden has devoted his professional life to the application of antitrust law. From 1977 to 2019, he served in the Antitrust Division of the U.S. Department of Justice. He contributed to antitrust scholarship while working in government and has continued to do so. His insights on the application of Section 2 of the Sherman Act were cited by appellate decisions relevant to this appeal. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 461–62 & n.13 (7th Cir. 2020); *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013).

## ISSUE PRESENTED

Whether the district court correctly granted summary judgment on claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, to a defendant that acted on a legitimate motive in terminating cooperation with a rival.

---

[1] All parties have consented to the filing of this amicus brief. No party's counsel authored any part of the brief, and no party, counsel, or any other person contributed funds for the preparation of the brief. The brief was written while Dr. Werden was a visiting scholar at the Mercatus Center at George Mason University, which is a not-for-profit organization. It did not defray the cost of submitting paper copies of the brief.

## STATEMENT

Align Technology, Inc. (Align Tech), produces the market-leading Invisalign brand of clear "aligners" for straightening teeth. Tailoring aligners to patients often begins with an intraoral scan, and Align Tech makes an intraoral scanner. Invisalign technology has been granted hundreds of patents, although some have expired.

3Shape also makes intraoral scanners, and it entered into a venture with Align Tech, referred to as the "interoperability agreement," pursuant to which a 3Shape scanner was made to work seamlessly with Invisalign aligner fabrication. The venture was troubled, and after about two years, Align Tech first sued 3Shape for infringing its patents, then terminated the venture (as to the U.S.).

The Simon plaintiffs (dental practices) and the Snow plaintiffs (patients) sought to recover damages from Align Tech's alleged monopolization of the aligner and scanner markets in violation of Section 2 of the Sherman Act. The Simon plaintiffs alleged that terminating the venture "would have been economically irrational but for the anticompetitive effects of that termination." 3-SnowER-401; *see also id.* at 409. The Snow plaintiffs made substantially the same allegation.  3-SnowER-345, 355.

Align Tech moved for summary judgment on the grounds that it terminated the venture for the legitimate reason of preventing 3Shape from using its continuation to bolster patent infringement defenses (which were raised). The district court granted the motion. The court found that plaintiffs did not dispute that a legitimate reason to terminate would defeat their claims. 1-SnowER–2–3. And the district court held that "a reasonable jury could not find that [Align Tech's] expressed concerns were a ruse or that the actions taken to address them were illegitimate." 1-SnowER-4.

The district court further held that plaintiffs had not created a triable issue as to whether other Align Tech conduct violated Section 2. The court concluded that other allegations "might have combined with the refusal-to-deal claim to form the basis of a larger antitrust claim, [but] they cannot stand on their own." 1-SnowER-6. Some of the court's thinking had been set out in its prior orders denying motions to dismiss. *Snow v. Align Tech., Inc.*, 586 F. Supp. 3d 972 (N.D. Cal. 2022); *Simon and Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904 (N.D. Cal. 2021).

## SUMMARY OF ARGUMENT

I. A unilateral refusal to deal violates Section 2 of the Sherman Act only if it makes no economic sense without a payout from eliminating competition.

   A. This court has adopted the "no economic sense" test.

   B. Three other circuits have adopted the "no economic sense" test.

   C. The lone circuit to reject the test misconstrued Section 2.

II. Objections to the district court's order stem from misunderstandings.

   A. Burdens differ between Sections 1 and 2 of the Sherman Act.

   B. Plaintiffs could not carry their initial burden under Section 2.

   C. The district court properly limited inquiry into subjective motivation.

## ARGUMENT

The Sherman Act always has been read to allow the termination of dealing for a legitimate business reason. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919); *E. States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 614 (1914) (citing the "unquestioned right to stop dealing"). "The Sherman Act aims to preserve the right of freedom to trade, and it does not infringe upon a company's right freely to exercise its own independent discretion as to parties with whom it will deal." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) (cleaned up).

"As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). The Supreme Court has been "very cautious" about making exceptions. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

An exception to the general rule made in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), remains "at or near the outer boundary" of liability under Section 2 of the Sherman Act. *Trinko*, 540 U.S. at 409. Critically, the defendant in that case not only terminated long-standing cooperation; it then refused to deal with its former partner on terms offered to the general public. *Id.*; *Aspen Skiing*, 472 U.S. at 593.

Appellants and their *amici* contend that the conduct at issue here falls well within the "outer boundary" of Section 2 liability, but they cite no precedent for what they advocate—treble damage liability for discontinuing voluntary interoperability. Unlike ordinary commerce or technology licensing, interoperability demands deep cooperation. Here, it entails cooperation on hardware and software design to make the machines of 3Shape and Align Tech communicate efficiently and effectively. Numerous trade secrets likely must be shared.

Amicus American Antitrust Institute (AAI) argues that the proper injunctive remedy in these cases is simple reversion to the prior arrangement between Align Tech and 3Shape, just as in *Aspen Skiing*. AAI Br. 25 (citing *Aspen Skiing*, 472 U.S. at 598 n.23). But the technology of intraoral scanners and aligners has advanced. Making 3Shape's newer scanners interoperable with Invisalign aligner fabrication would require renewed deep cooperation to implement new technologies.

"[C]ourts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). AAI asserts that imposing liability here presents no such risk because Align Tech remains free to charge monopoly prices for aligners. AAI Br. 21–23, 26. But AAI ignores plaintiffs' contention that Align Tech's monopoly profits are ill-gotten gains, and AAI misperceives the potential chilling effect.

Plaintiffs seek damages that would dwarf the $7.5 million awarded in *Aspen Skiing*. *Aspen Skiing*, 472 U.S. at 598. An award in the hundreds of millions of dollars would send the message that terminating cooperation with a rival, even for a legitimate business reason, risks a penalty out of proportion to the potential gain. Substantial procompetitive cooperation easily could be chilled.

6

## I. Refusal-to-Deal Claims under Section 2 of the Sherman Act Should Be Subject to the "No Economic Sense" Test

In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), the United States advocated the "no economic sense" test for unilateral refusals to deal: "Where, as here, the plaintiff asserts that the defendant was under a duty *to assist a rival*, the inquiry into whether conduct is 'exclusionary' or 'predatory' requires a sharper focus. In that context, conduct is not exclusionary or predatory *unless* it would make no economic sense for the defendant but for its tendency to eliminate or lessen competition." Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Petitioner at 15, *Trinko*, 540 U.S. 398 (No. 02-682).

The "no economic sense" test respects the "high value that [the Supreme Court has] placed on the right to refuse to deal with other firms," *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985), and the "unquestioned right to stop dealing," *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 614 (1914). The "no economic sense" test hardwires a judicial "reluctance to impose a duty to deal," *Aerotec Int'l Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016).

## A. This Court Has Adopted the "No Economic Sense" Test

1. Drawing on its prior decisions, this court declared that "a company engages in prohibited, anticompetitive conduct when (1) it unilaterally terminates a voluntary and profitable course of dealing; (2) the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition; and (3) the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993–94 (9th Cir. 2020) (cleaned up).

The district court properly applied condition (2) in holding that Align Tech is not liable because, "It's undisputed that termination of the interoperability agreement was bound up in Align [Tech]'s decision to initiate intellectual property litigation against 3Shape." 1-SnowER-3. The district court concluded that condition (2) "is just another way of stating . . . that there can only be refusal-to-deal liability in the absence of a legitimate, non-pretextual business justification." 1-SnowER-5–6.

This court described the *Qualcomm* conditions as "required elements for the *Aspen Skiing* exception" to the right to refuse to deal, which was the only exception the court recognized. *Qualcomm*, 969 F.3d at 995, 997. As "required elements," the conditions define the plaintiffs' burden. Contrary to

a curious argument advanced by the United States, U.S. Br. 29, the phrase "only conceivable rationale" in condition (2) must be part of what defines the plaintiffs' burden. And due to that phrase, condition (2) is best understood as the "no economic sense" test.

2. This court first articulated what amounts to the "no economic sense" test in a predatory pricing case. *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014 (9th Cir. 1981). The court declared that "conduct that will support a claim of attempted monopolization must be such that its anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power. Such conduct is not true competition; it makes sense only because it eliminates competition." *Id.* at 1030–31. And the court held that "to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power." *Id.* at 1035.

This court then asserted the "no economic sense" test in a refusal-to-deal case. *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360 (9th Cir. 1988). The court reversed a jury finding of monopolization because the jury was improperly instructed that its task was to determine the primary motivation

9

for the refusal. The court held that the jury "should have been instructed that the desire to maintain market power—even a monopolist's market power—cannot create antitrust liability if there was a legitimate business justification for refusing." *Id.* at 369. The court also held that the Sherman Act imposes "affirmative duties" "to aid a competitor" "only when there is no justification for refusing." *Id.* at 368. *See also Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (per curiam) (stating *Oahu Gas* holds that a "legitimate business justification immunizes monopolist against claim by competitor that it failed to aid").

The court effectively applied the "no economic sense" test by rejecting a Section 2 claim even though the defendant also acted "on a desire to restrict the supply of propane." *Oahu Gas*, 838 F.2d at 368. The court reasoned: "Where a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct. *Id.* The United States overlooks this reasoning in correcting observing that declining the refinery expansion in *Oahu Gas* was legally justified because it "would have been uneconomical." U.S. Br. 22 (quoting *Oahu Gas*, 838 F.2d at 368).

### B. Other Circuits Have Adopted the "No Economic Sense" Test

The Eighth Circuit quoted *William Inglis* in declaring: "The exercise of business judgment cannot be found to be anti-competitive. To be labeled anti-competitive, the conduct involved must be such that its 'anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.'" *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984). The decision set aside a jury verdict in favor of plaintiff under Section 2. The court held that the defendant's "ordinary business practices typical of those used in a competitive market" did not violate Section 2 because they made economic sense even without any tendency to harm competition. *Id.* at 266–67.

More recently, Judge (now Justice) Gorsuch adopted the "no economic sense" test in affirming judgment as a matter of law following an eight-week trial. *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013). The case involved an abrupt termination of efforts to promote interoperability.

Before Microsoft introduced Windows 95, it shared new intellectual property with independent software vendors (ISVs), including Novell which marketed WordPerfect and an associated office suite. The sharing allowed the ISVs to begin developing Windows 95 versions of their applications. But

11

Microsoft quickly changed its mind and informed ISVs that it was unsafe to assume that what had been shared would be part of the final version of Windows 95. As a consequence, Novell's Windows 95 applications were released nine months after Microsoft's, and Novell brought suit under Section 2 of the Sherman Act. *Id.* at 1067–69.

Judge Gorsuch set out three necessary conditions for refusal-to-deal liability under Section 2: "[T]here must be a preexisting voluntary and presumably profitable course of dealing between the monopolist and rival." *Id.* at 1074. "[T]he monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end." *Id.* at 1075 (cleaned up). And because "firms routinely sacrifice short-term profits for lots of legitimate reasons that enhance consumer welfare," there must be "a showing that the monopolist's refusal to deal was part of a larger anticompetitive enterprise." *Id.* "Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect." *Id. Accord St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 486 (6th Cir. 2021).

Judge Gorsuch relied on *Aspen Skiing*'s recognition that "a refusal to deal with a competitor doesn't violate section 2 if valid business reasons exist for that refusal," on *Trinko*'s declaration that the "defendant must be seeking an

anti-competitive end," and on the leading antitrust treatise's pronouncement that "the refusal must be irrational but for its anticompetitive tendencies." *Id.* (internal quotation marks omitted) (citing 3B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 772, at 223 (3d ed. 2008)).

## C. How the "No Economic Sense" Test Works

1. As additional authority, Judge Gorsuch cited Gregory J. Werden, *Identifying Exclusionary Conduct Under Section 2: The "No Economic Sense" Test*, 73 Antitrust L.J. 413, 422–25 (2006). The article states the "no economic sense" test: "If conduct allegedly threatens to create a monopoly because of a tendency to exclude existing competitors, the test is whether the conduct likely would have been profitable if the existing competitors were not excluded and monopoly was not created. If conduct allegedly maintains a monopoly because of a tendency to exclude nascent competition, the test is whether the conduct likely would have been profitable if the nascent competition flourished and the monopoly was not maintained." *Id.* at 417.

Judge Gorsuch cited the portion of the article explaining (1) how the test builds on insights about what constitutes exclusionary conduct, and (2) why short-term profit sacrifice is neither sufficient nor necessary for exclusionary conduct. *Id.* at 422–25. The reasons are that every ordinary investment

entails a short-term profit sacrifice, and that exclusionary conduct can have an immediate payout, obviating any short-term profit sacrifice.

The "no economic sense" test defines a critical element of the plaintiff's burden at each stage of litigation. The complaints that began these cases were drafted to meet the pleading burden of the "no economic sense" test. *See supra* at 2. And plaintiffs' counsel explicitly conceded that they lose on summary judgment if "no reasonable juror could conclude that the sole reason for termination of interoperability" was to harm competition. 2-SnowER-51. The district court relied on this concession and granted summary judgment because no reasonable juror could so conclude.

The United States argues that a business purpose must be "valid" and "sufficient" to defeat a claim, U.S. Br. 15–18, and the "no economic sense" test implements both requirements. As a scholar relied on by amicus AAI explained, the "no economic sense" test is "essentially equivalent" to asking "whether the defendant's refusal lacks a 'valid business purpose,' where implicitly a 'valid' purpose is one whose utility does not hinge on harm to competition." Erik Hovenkamp, *The Antitrust Duty to Deal in the Age of Big Tech*, 131 Yale L.J. 1483, 1499 (2022). Sufficiency is assured by the fact that the test asks whether achieving the legitimate business purpose is enough to make the conduct rational without any payoff from harming competition.

The "no economic sense" test can avoid costly trials when, as here, the undisputed evidence demonstrates a legitimate business reason for a refusal to deal. The "no economic sense test," thus, responds to the Supreme Court's encouragement of the use of summary judgment in antitrust cases. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). *See also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 921 (9th Cir. 2015) (observing that "any presumption against the granting of summary judgment in complex antitrust cases has now disappeared").

2. Amicus AAI mistakenly argues that the district court treated Align Tech's conduct as privileged because of its connection to patent litigation. AAI Br. 7–14. AAI (*id*. at 7) largely bases this argument on the district court's correct statement that, "The desire to protect and enforce patent rights is a presumptively valid business justification." 1-SnowER-3. The court's larger point, however, was that Align Tech was entitled to terminate the venture for a valid and sufficient business reason. The court explained that "the plaintiffs here do not contend that Align [Tech]'s patent claims against 3Shape were a sham or lacked merit. Nor, for example, have the plaintiffs contended that the patent claims, even if meritorious, were so low in value as to make litigating them irrational." *Id.*

### D. The Seventh Circuit Misconstrued Section 2 When it Rejected the "No Economic Sense" Test

The Seventh Circuit created a circuit split on the treatment of refusals to deal under Section 2 when it rejected the "no economic sense" test advocated then by the United States. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 461–62 & n.13 (7th Cir. 2020). At bottom, the Seventh Circuit rejected the "no economic sense" test on the view that it was not designed "to answer the ultimate question of whether competition was harmed." *Id.* at 462. But the "no economic sense" test was designed to answer the more focused question posed by Section 2, which is whether methods employed by a defendant are legitimate. Legitimate methods definitionally do not harm the competitive process and are lawful even when competitors are harmed.

The "possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Section 2, therefore, asks "whether the defendant engaged in 'unfair' or 'predatory' tactics." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). The drafters clearly intended this inquiry. When the Senate Judiciary Committee rewrote John Sherman's original bill, Chairman George F. Edmunds (R-Vt.) assured fellow senators that the new Section 2 did not prohibit success "by virtue of . . . superior skill." 21 Cong. Rec. 3151 (1890).

Committee member George F. Hoar (R-Mass.) added that "to monopolize" meant to use "means which made it impossible for other persons to engage in fair competition." 21 Cong. Rec. 3152 (1890).

From the outset, Section 2 of the Sherman Act was understood to distinguish between "legitimate" and "illegitimate" methods of competition. The first appellate judge to interpret Section 2 (Howell E. Jackson) was "certain" that it did not interfere with "legitimate means" of creating or maintaining a monopoly. *In re Greene*, 52 F. 104, 115 (C.C.S.D. Ohio 1892). And Chief Justice White did not condemn Standard Oil because its tactics led to market dominance, but rather because the tactics that led to Standard Oil's dominance were not "normal methods of industrial development." *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 75 (1911); *see id.* at 43 (condemning "unfair methods of competition").

Modern decisions explain that Section 2 prohibits only "predatory or exclusionary means of attempting to monopolize the relevant market, rather than aggressive competition on the merits." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545–46 (9th Cir. 1983). "The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports*, 506 U.S. at 458.

## II. These Cases Raise No Issues Relating to a Defendant's Rebuttal Burden

### A. These Cases Are Not Subject to the Rule of Reason, So Burdens Are Allocated and Calibrated Differently

"Regardless of whether the alleged antitrust violation involves concerted anticompetitive conduct under § 1 or independent anticompetitive conduct under § 2, the three-part burden-shifting test under the rule of reason is essentially the same." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020). But the standards are different! *See id.* at 989–92. And "proving an antitrust violation under § 2 of the Sherman Act is more exacting than proving a § 1 violation." *Id.* at 992. In *Qualcomm*, this court reversed a Section 2 decision in favor of the Federal Trade Commission (FTC) because the FTC failed to carry its initial burden. *Id.* at 993–97 (unilateral refusal-to-deal theory), 997–1003 (distinct theory).

The "Sherman Act contains a basic distinction between concerted and independent action." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (cleaned up). "Congress used this distinction between concerted and independent action to deter anticompetitive conduct and compensate its victims, without chilling vigorous competition through ordinary business operations. The distinction also avoids judicial scrutiny of routine, internal business decisions." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010).

Section 1 of the Sherman Act, 15 U.S.C. § 1, applies to concerted conduct, but "Congress intended to outlaw only unreasonable restraints" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Under Section 1's rule of reason, "The true test for legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of the City of Chi. v. United States*, 246 U.S. 231, 238 (1918). Consequently, a Section 1 justification is a "procompetitive rationale" for a restraint. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 985–86 (9th Cir. 2023).

Section 2 cases are not governed by *Chicago Board of Trade*'s rule of reason, and a Section 2 justification, instead, explains why suspect conduct is "competition on the merits." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 n.12 (9th Cir. 1997) (jury instruction). Competition on the merits extends beyond procompetitive conduct to include all "routine, internal business decisions." Case examples include a decision not to expand a refinery, *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368–69 (9th Cir. 1988), and a decision to stop selling to a customer for non-payment, *Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266–67 (8th Cir. 1984).

To limit scrutiny of "internal business decisions," the Supreme Court ratcheted up the plaintiff's initial burden under Section 2. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007) (predatory pricing or bidding); *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) (unilateral refusals to deal). The Court completely barred stand-alone claims of price squeeze. *Pac. Bell Tel. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009).

A Section 2 plaintiff has the initial burden of proving that the defendant departed from competition on the merits. *See Qualcomm*, 969 F.3d at 995–97; *Dreamstime. com, LLC v. Google LLC*, 54 F.4th 1130, 1137–38 (9th Cir. 2022); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP*, 592 F.3d 991, 998–1000 (9th Cir. 2010); *Foremost Pro Color v. Eastman Kodak Co.*, 703 F.2d 534, 544–45 (9th Cir. 1983); *see also infra* pp. 21–22.

The United States and AAI fail to appreciate the import of the Sherman Act's "distinction between concerted and independent action" in arguing that the district court should have demanded that Align Tech's "justification" be "procompetitive." U.S. Br. 16; AAI Br. 17, 19. The district court correctly granted summary judgment on the basis that plaintiffs here could not carry their initial burden under Section 2.

## B. The District Court Properly Held that Align Tech Showed that Plaintiffs Failed to Raise a Triable Issue

1. The district court correctly held that *plaintiffs* could not carry *their* burden under Section 2 of the Sherman Act. In essence, the court held that plaintiffs could not prove that Align Tech departed from competition on the merits. This issue before this court is whether the district court properly calibrated the plaintiffs' burden.

The United States is badly mistaken when it asserts that: "Once a plaintiff makes an initial showing that a monopolist's refusal is predatory and harms competition, the monopolist may respond by showing a business justification for its conduct. The issue in these cases is the proper standard for evaluating such justifications." U.S. Br. 14 (citations omitted).

In Section 2 cases, "plaintiffs are required to prove" exclusionary conduct. "To be condemned as exclusionary, a monopolist's act must have an anticompetitive effect—that is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020) (cleaned up). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

The "plaintiff, on whom the burden of proof of course rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect." *United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001) (en banc) (citations omitted). The burden is substantial for refusal-to-deal claims because of the "the Supreme Court's reluctance to impose a duty to deal." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1183 (9th Cir. 2016).

The district court's grant of summary judgment squarely rested on plaintiffs' inability to prove that Align Tech's termination of its venture with 3Shape had the requisite anticompetitive effects. Even if the termination impaired 3Shape's opportunities, the court found that it did not depart from competition on the merits because Align Tech made the rational business decision to blunt 3Shape's defenses to patent infringement. Plaintiffs were not entitled to a trial because undisputed evidence established that they could not carry their initial burden.

2. The United States argues that everything this court needs to know about "justifications" in refusal-to-deal cases can be gleaned from *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). U.S. Br. 15–19. Plaintiffs in the case were independent service organizations (ISOs) for Kodak copiers and micrographic equipment. The ISOs brought a tying

claim under Section 1 and a refusal-to-deal claim under Section 2. The gist of both was that Kodak monopolized markets for parts and service of Kodak machines by refusing to sell parts to ISOs. This court reversed summary judgment for Kodak. *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 903 F.2d 612 (9th Cir. 1990). The Supreme Court then took the case to address its novel focus on single-brand aftermarkets. *See Kodak*, 504 U.S. at 455–56.

While this court addressed Kodak's "justifications" primarily in the context of the tying claim (*Kodak*, 903 F.2d at 618–19), the Supreme Court addressed them in the context of the refusal-to-deal claim (*Kodak,* 504 U.S. at 483–87). But the Court's receptivity to the "justifications" was colored by its rejection of Kodak's contention that the case involved "only a unilateral refusal to deal." *Id.* at 463 n.8. The Court stressed that Kodak had sold "parts to third parties on condition that they buy service from Kodak," *id.*, so the refusals to deal were in furtherance of tying. In any event, the Court held only that Kodak was not entitled to summary judgment because the particular "justifications" at issue presented disputed issues of fact that had to be resolved at trial. *Id.* at 483–86.

The United States is wrong to suggest that *Trinko* had no impact on how antitrust claims are evaluated on summary judgment. U.S. Br. 19. Prior to *Trinko*, this court had reversed summary judgment in favor of the defendant

in a refusal to deal case. *MetroNet Servs. Corp. v. US West Commc'ns*, 329 F.3d 986 (9th Cir. 2003). But the Supreme Court vacated the opinion and remanded the case for reconsideration in the light of *Trinko*. On remand, this court affirmed summary judgment in favor of the defendant. *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004). The court plainly evaluated the refusal to deal claim differently because of *Trinko*.

3. Like plaintiffs, the United States argues that summary judgment was improper here because a disputed fact was whether terminating the venture actually helped Align Tech fend off 3Shape's defenses in the patent litigation. U.S. Br. 20. The district court, however, held that there was no dispute about whether Align Tech "was concerned about the effect of the interoperability agreement on the litigation." 1-SnowER-4. Because the concern was genuine and substantial, and the district court properly rejected plaintiffs' contention that they were entitled to a trial so they could try to prove that Align Tech should not have been concerned; that was "beside the point." *Id.*

### C. The District Court Properly Limited the Inquiry into Subjective Motivation

In the Ninth Circuit, a Section 2 plaintiff may negate an asserted business reason for challenged conduct by demonstrating that it is "pretextual," which is a matter of "subjective motivation." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1212–14, 1219–20 (9th Cir. 1997). Specifically, this court held that "state of mind" evidence "may show pretext, when such evidence suggests that the proffered business justification played no part in the decision to act." *Id.* at 1219; *see also id.* at 1220 n.12 (jury instruction). Kodak's patent-related justification for refusing to deal was rejected (by the judge in a jury case) as pretextual because a Kodak manager testified that it played no part in the decision to act. *Id.* at 1219.

Here, the district court held that plaintiffs could not prove that Align Tech's business reason for terminating the venture was pretextual in the sense that it did not play a substantial part in the decision to act. The court found that the "termination of the interoperability agreement was bound up in the pursuit of patent litigation whose legitimacy the plaintiffs do not challenge." 1-SnowER-4. The court found that Align Tech "had long been concerned about patent infringement by 3Shape" and "was concerned about the effect of the interoperability agreement on the [infringement] litigation." *Id.* And the court properly held that "to get to a jury, the plaintiffs would need

to come forward with strong evidence that this was all a ruse." *Id.* The district court undertook the inquiry into motivation that this court endorsed in *Kodak* and further observed that plaintiffs had not "contended that the patent claims, even if meritorious, were so low in value as to make litigating them irrational." 1-SnowER-3.

AAI contends both that the district court did not inquire into Align Tech's motivation, and that the court required plaintiffs to prove that Align Tech's "justification" lacked an objective basis. AAI Br. 12–13. But AAI is mistaken. The district court correctly required plaintiffs to prove that fending off 3Shape's defenses in the patent litigation was not a substantial motivation for the termination.

This court should reject the unstructured inquiry into "purpose" advocated by the United States. U.S. Br. 24–27. While that inquiry finds support in some older decisions, it is inconsistent with current circuit precedent (*see, e.g.*, *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 368–69 (9th Cir. 1988)) and wholly impractical. When business decisions have multiple motivations, as is typical, decisional documents are unlikely to identify a single overriding purpose, and certainly will not label particular motives as "sufficient" or "predominant." Inquiry into subjective motivation is best avoided altogether.

## CONCLUSION

The district court applied the correct legal standard and properly granted summary judgment to Align Tech on plaintiffs' claim under Section 2 of the Sherman Act.

Respectfully submitted,

October 25, 2024

/s/ *Gregory J. Werden*

Gregory J. Werden
1029 N. Stuart St. #310
Arlington, VA 22201
Tel: 703-527-5128
Email: gregwerden@gmail.com

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number(s)**  24-1703, 24-1783

I am the amicus curiae.

**This brief contains**  5,677  **words,** including  0  words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○  complies with the word limit of Cir. R. 32-1.

○  is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⊗  is an **amicus brief** and complies with the word limit of FRAP 29(a)(5), Cir. R.29-2(c)(2), or Cir. R. 29-2(c)(3).

○  is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○  complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

○  complies with the length limit designated by court order dated     .

○  is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Gregory J. Werden         **Date**  October 25, 2024

## CERTIFICATE OF SERVICE

I certify that on October 25, 2024, I caused the foregoing to be filed through this court's Electronic Document Submission System. I also certify that I emailed the brief to counsel for all parties. All parties waived service by mail.

October 25, 2024          */s/ Gregory J. Werden*
                          Gregory J. Werden